**GLENN, Collector of Internal Revenue, v. STANDARD OIL CO.**

No. 9834.

Circuit Court of Appeals, Sixth Circuit.

March 12, 1945.

Lyle M. Turner, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, and Lyle M. Turner, all of Washington, D. C., and Eli H. Brown, III, of Louisville,. Ky., on the brief), for appellant.

Charles G. Middleton, of Louisville, Ky. (Charles G. Middleton, Hubert T. Willis, and Bullitt & Middleton, all of Louisville, Ky., on the brief), for appellee.

Before HICKS, HAMILTON, and Mc-ALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

The Standard Oil Company, a Kentucky corporation, filed action to recover from the Collector of Internal Revenue, certain taxes for the years 1936 to 1940, inclusive, claimed to have been erroneously assessed and collected under provisions of the Social Security Act, 42 U.S.C.A., §§ 1004 and 1101. The district court entered judgment for the Company, and the Collector appeals.

The issue is whether certain commission agents are independent contractors or employees of appellee company within the meaning of §§ 811(b) and 907(c) of the Social Security Act, 42 U.S.C.A. §§ 1011(b) and 1107(c), and §§ 1426(b) and 1607(c) of the Internal Revenue Code, 26 U.S.C.A., Int.Rev.Code §§ 1426(b) and

1607(c), which define "employment" as any service of whatever nature, performed within the United States, by an employee for his employer. It is agreed that if the commission agents in question are independent contractors, the company is not liable for the taxes; if they are employees, the company is so liable.

■ The Social Security Act recognizes the common-law definition of independent contract and excludes such relationship from the burden of the tax. United States v. Mutual Trucking Co., 6 Cir., 141 F.2d 655; Glenn v. Beard, 6 Cir., 141 F.2d 376, certiorari denied 323 U.S. ——, 65 S.Ct. 57; Texas Co. v. Higgins, 2 Cir., 118 F.2d 636. See also, Kentucky Cottage Industries v. Glenn, D.C., 39 F.Supp. 642.

■ It is the rule in general, that if an individual is subject to the control or direction of another, merely as to the result to be accomplished by the work, and not as to the means and method of accomplishing the result, he is an independent contractor and not an employee. Generally, when the person for whom the services are performed, has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work, but also as to the details and means by which that result is accomplished, such individual is an employee. Glenn v. Beard, supra. Treasury Regulations 90, Art. 205. The main question in all cases of this type is whether or not the one who is claimed to be an independent contractor has contracted to do the work according to his own methods, and without being subject to the control of his employer, except as to the result of his work. Singer Mfg. Co. v. Rahn, 132 U.S. 518, 10 S.Ct. 175, 33 L.Ed. 440; American Oil Co. v. Fly, 5 Cir., 135 F.2d 491; Indian Refining Co. v. Dallman, D.C., 31 F.Supp. 455, affirmed, 7 Cir., 119 F.2d 417; Ruth Bros. v. Stambaugh's Adm'r, 275 Ky. 677, 122 S.W.2d 501.

■ The character of the relation is to be determined by the rights and obligations assumed, as disclosed in the terms of the written contract, as well as in the actual practices of the parties in their dealings with each other; and in considering the questions presented, it is necessary to outline the pertinent circumstances of the case, as appear from the record and as found by the trial court.

Appellee carries on business in several states, distributing its products through commission agents in charge of its bulk distributing plants. The Company and such commission agents entered into written contracts, subject to immediate cancellation by either party, under which the agents agreed to act for the Company in the sale of its products on a commission basis, in designated areas, receiving as their entire compensation therefor, specified commissions on the sales.

The Company owns all the real estate on which the distributing plants are located, as well as the tanks situate thereon, and the stations bear its name. All products delivered to the agent by the Company, were also its property, for which the agent was required to account at regular intervals, by inventory reports. Cash receipts were deposited daily by the agent in the local bank in the name of the Company, and the Company would thereafter remit the commissions to the agents at regular intervals. Certain customers approved by the Company could buy on credit. Agents who sold to other customers on credit assumed liability for their failure to pay their accounts. The agents were required to purchase their own delivery trucks, upon which the Company placed its own tanks, with its name painted thereon. In addition, the agents purchased, at their own expense, such office equipment and trucks as they considered necessary to operate properly; they also employed and paid all the truck drivers and other employees required to carry on the business. The Company had nothing to say about the persons so employed by the agents; it was not consulted and its approval was neither required nor obtained. Hours of work for such employees, vacation periods, compensation, right of discharge, and rules respecting their employment, were matters exclusively within the control of the commission agents.

For the most part, the agents advertised the business at their own expense, in newspapers, on the radio, and by means of calendars and novelties. The Company fixed the sales prices of its products and the agents generally conformed therewith. But in cases where, for any reason, they sold at prices lower than those fixed by the Company, they took a reduction in the amount of their commission. The Company furnished the agents with a rule book, entitled: "Rules for Operation of Bulk Plants,"

which detailed safety measures, provisions for the care of the Company's funds, repair and maintenance of its property, and methods for successful operation of the business. In addition, the Company mailed to the commission agents, from time to time, certain circular letters, dealing with the proper operation of the business and, on various occasions, held sales conferences, which the agents were asked to attend. Twice a year an auditor employed by the Company visited the stations and inspected the operations and methods of doing business, but gave no orders or instructions. The agents kept, at their own expense, the books relating to the operation of the plants, which were retained by them when the contract relationship with the Company was terminated.

The agents so selected, appointed, and contracted with by the Company were well-known men in their local communities, with good reputations and usually with substantial business interests in other lines of endeavor; and it appears that they were selected by the Company with the view that their financial backing and prestige would command business patronage. The agents had an investment in the business, according to the testimony, ranging from a minimum of $2,000 to a maximum of $60,000. Operations of the agents ranged from small commissions up to commissions of $31,000 per year. There was no requirement respecting the amount of time that the agents would give to the business. Some agents gave full time to the operation of the Company's bulk plants; others gave it merely supervisory attention, devoting not more than an hour, or even less, each day, and spent most of their time managing other businesses, or in other gainful occupations. Each agent operated the bulk plant in such a way as in his opinion would produce the greatest volume of sales, paying his own expenses, keeping his own books, hiring and discharging his own employees, and devoting as much or as little time to the business as was commensurate with its size and his other interests. The Company looked to each agent for a satisfactory volume of sales, and as long as the results were satisfactory, the contract between the Company and the agent was continued. But in securing the foregoing sought-for volume of sales the Company did not attempt to control the details and means by which the agent accomplished it; and it is remarkable that, in some instances, the commission agents sold and distributed commodities of other producers, competitive with the Company's products.

The Government contends that the written contracts between the Company and the commission agents evidence an employer-employee relationship; that the rules for the operation of the bulk plants which were issued by the Company to all agents—and the actual practices of the parties in their dealings with each other—established the Company's right to control the means and methods of conducting the business.

There are two types of contract in this case, one effective prior to December 31, 1937, and the other effective after that date. The Government emphasizes that in the contracts in effect prior to December 31, 1937, the agent agreed: (a) To unload, store, ship, sell, and deliver the Company's products at and from the plant into the area prescribed by the Company; (b) to diligently solicit business for the account of the Company, on all of the Company's products, as requested by it; (c) to·be responsible for all goods and equipment entrusted to him and to account therefor; (d) to remit promptly all monies received from the sale of products belonging to the Company; and (e) to furnish, maintain, and operate sufficient delivery equipment and to employ sufficient assistants to properly handle the business as determined by the Company. It was further provided that either party might immediately cancel the agreement by notifying the other party of his intention to do so; and perhaps most strongly emphasized is a provision that the agent agreed to follow all instructions given him in regard to prices and the general conduct of the business of the Company.

With the exception of the last-mentioned provision, all of these stipulations appear in practically the same language in the numerous cases in which it has been held that similar commission agents, operating bulk plants for oil companies, were independent contractors. American Oil Co. v. Fly, 5 Cir., 135 F.2d 491; Indian Refining Co. v. Dallman, D.C., 31 F.Supp. 455; affirmed in 7 Cir., 119 F.2d 417; Orange State Oil Co. v. Fahs, D.C., 52 F.Supp. 509; affirmed in Fahs v. Orange State Oil Co., 5 Cir., 138 F.2d 743; Texas Co. v. Higgins, D.C., 32 F.Supp. 428, affirmed in 2 Cir., 118 F.2d 636; American Oil Co. v. Wheeless, 185 Miss. 521, 187 So. 889; Barnes v. Indian Refining Co., 280 Ky. 811, 134 S.W. 2d 620. The latest case to the same effect

is Gulf Oil Corporation v. United States, D.C., 57 F.Supp. 376. See also, United States v. Mutual Trucking Co., 6 Cir., 141 F.2d 655; Walling v. Sanders, 6 Cir., 136 F.2d 78; Anglim v. Empire Star Mines Co., 9 Cir., 129 F.2d 914.

The Government contends that the contract, with the provisions above emphasized, is not distinguishable from the agreement which the Supreme Court construed as an employment contract in Singer Mfg. Co. v. Rahn, supra, and that in failing to reach a like result the trial court clearly was in error. However, it appears that in the cited case, Mr. Justice Gray speaking for the court, stated that the most significant stipulation in the contract there under consideration was that one Corbett, the individual claimed to have been an independent contractor, had by a written contract agreed "to give his exclusive time and best energies" [132 U.S. 518, 10 S.Ct. 176] to the business and further, had agreed "to employ himself under the direction of the said Singer Manufacturing Company, and under such rules and instructions as it, or its manager * * * shall prescribe." The company had funished Corbett with a wagon, and he furnished a horse to be used exclusively in canvassing for the sale of the company's machines and the general prosecution of its business. The court held that Corbett, for the commissions to be paid to him, had agreed "to give his whole time and services to the business of the company"; and that the company reserved to itself the right of prescribing and regulating not only what business he should do, but the manner in which he should do it; "and might, if it saw fit, instruct him what route to take, or even at what speed to drive." 132 U.S. at page 523, 10 S.Ct. at page 177, 33 L.Ed. 440. How entirely inapplicable this case is to the present controversy, appears from the bare mention of the fact that the agents in the case before us in no way stipulated as to the amount of time they would devote to the business or that they would devote their efforts exclusively to it. Rather, it was understood that whatever time or effort they were to give to the business was a matter to be determined by the agents themselves.

■ With reference to the provision in which the agent agreed to follow all instructions given him in regard to the general conduct of the business of the company it may be said that this is not indicative of control of the means and methods which the agent uses to sell the Company's products.

■ We come, then to the contracts which were effective subsequent to December 31, 1937: On December 1, 1937, the Company requested the agents to sign new contracts to become operative in the year 1938. Changes were made in the phraseology of the previous contracts to the effect that the assistants at the bulk plants should be hired, discharged, paid, and controlled by the agent and not by the Company. This did not change the prior contract but only added some verbiage to it. The new contracts stated that the relationship between the Company and agent should be that of principal and agent and not that of employer and employee. The Company had always claimed that this was the relation anyway. Nothing had been mentioned on this point in the prior agreement, and the fact that the terms of the contract were supplemented in this regard, after the Commissioner had claimed that the relationship was that of employer and employee, is of no importance in establishing the legal relationship. And it does not render the Company culpable on the ground that the changes were patently intended for tax avoidance purposes.

In answer to the contention of the Government that the rules for the operation of the bulk plants clearly established the Company's right to control the means and methods of conducting the business we have failed to find anything in the rules to show a reservation of control on the part of the Company over the methods and means employed by the agent in carrying out the business of selling the Company's products. The rules are concerned with inspections, mostly for safety reasons, and with auditing, repairs, and maintenance of the Company's property.

Although, the Government insists that it is indisputably established that the Company possesses the right to control the means and methods *of operating the bulk plant,* the important fact to be remembered is that the contracts between the Company and the agents are not directed to the operation of a plant as such. "The contract is directed toward results and not how they are obtained." Barnes v. Indian Refining Co., 280 Ky. 811, 134 S.W.2d 620, 623, 624. The agent "is responsible to the company for results, but, except to the ex-

tent that an interest in the results may influence methods of operation, the company does not control the details of his operation or have a right to exercise any control thereof." Ibid., quoted in Indian Refining Co. v. Dallman, D.C., 31 F.Supp. 455, 459. "The business contemplated by the relationship between the plaintiff and the operators in this case was the sale and distribution of petroleum products. Requirements by plaintiff that records of the quantity of the product received, the sale thereof, the quantity on hand, and other similar requirements as to the form of accounting does not constitute control by the plaintiff of the means and methods employed by the operator *in accomplishing the result sought, which was the sale and distribution of the product.*" (Italics supplied.) Orange State Oil Co. v. Fahs, supra, 52 F.Supp. at page 511.

"The provisions of the contracts and the actual conduct of the business were directed toward the result to be obtained under the consignment agreements; that is, the amount of the sales." Indian Refining Co. v. Dallman, 31 F.Supp. 455, 458, supra.

In American Oil Co. v. Fly, supra, the facts were so similar to those in the case before us and the well-reasoned opinion of Judge Sibley so applicable to the matter here under discussion, that we quote the concluding paragraph, which outlines the determining factors and the disposition of the issue, 135 F.2d at page 493:

"These contracts are an arrangement whereby the Oil Company seeks to sell its products from its own warehouse in the greatest possible volume, and they make several provisions as to how the proceeds are to be safeguarded and accounted for. But the work of selling and distributing is left, as to means and details, to the distributor. He finds his customers as and where he thinks best, makes the price he can afford and can get, uses his own equipment, and helpers selected, controlled and paid wholly by himself. We see no basis at all to think these helpers are the servants of the Oil Company, since the contract is to the exact contrary, and the Company has no voice in their selection, control or discharge. The distributor himself is not the servant of the Oil Company, but an independent contractor, determining for himself when and where he will work, with whom he will deal, how he will deliver what he sells, and whether in most instances he will credit. He is himself bound to pay at all events for all products he receives, at the prices made to him by the Company, except those left unsold, or sold by special authorization to certain customers. The possibility of cancellation of the contract if he displeases the Company might be used as a club to force compliance with any requirement of the Company, but it does not give any *right* of control beyond that given by the contract. According to the contract and the practice under it the distributor engages to find customers and sell products and deliver them. The persons and the particular means he will employ are left entirely to his control. Although the business done is the business of the Oil Company and the products and their proceeds are its property, the distributors are not employees under the Act, and the persons they employ, though employees, are not the employees of the Oil Company. The taxes were illegally collected."

We may here repeat what was said in Gulf Oil Corporation v. United States, supra: "All of the adjudicated cases which involve the same question, or substantially the same have been decided in favor of plaintiff's contention." 57 F.Supp. at page 380. It is unnecessary to rehearse the evidence to enumerate the indicia of the relationship of independent contractor and employee. "The quality of the relationship is to be judged by the presence or absence of no single evidentiary factor, but by an over-all view." Anglim v. Empire Star Mines Co., supra [129 F.2d 917). Congress could scarcely have meant that men doing business like the agents in this case were to enjoy the benefits of unemployment allowances; and if they were not employees of the company, their assistants were not. Texas Co. v. Higgins, 2 Cir., 118 F.2d 636, 638.

■ The finding of the trial court that the Company did not attempt to control the details and means by which the agents accomplished their results—as well as its other findings of fact—is sustained by the evidence and we concur in its conclusions of law.

The judgment of the district court is affirmed.