UNITED STATES v. WHOLESALE OIL
CO., Inc.

No. 3244.

Circuit Court of Appeals, Tenth Circuit.

March 15, 1946.

Hilbert P. Zarky, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, A. F. Prescott, and Maurice P. Wolk, Sp. Assts. to Atty. Gen., and Randolph Carpenter, U. S. Atty., and Eugene W. Davis, Asst. U. S. Atty., both of Topeka, Kan., on the brief), for appellant.

Frank S. Hodge, of Hutchinson, Kan. (Roy C. Davis, Warren H. White, William H. Vernon, Jr., and Eugene A. White, all of Hutchinson, Kan., on the brief), for appellee.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This case arises under the Social Security Act, 49 Stat. 620, as amended, 42 U.S.C.A. § 301 et seq. The appellee, the Wholesale Oil Company, Inc.,[1] sued the United States to recover social security taxes which it had paid under protest. It recovered a judgment therefor, and the government has appealed. The only question is whether the persons who operated retail gasoline filling stations owned by the Company were employees within the meaning of the Act. The facts are substantially these:

The Company is a Kansas corporation, engaged in the distribution of petroleum products. In 1938 and through 1940 it entered into written agreements with individuals for the operation of the filling stations owned by it. While differing in some respects, the contracts are substantially the same. They generally provide that the Company was to furnish all equipment, funds, and merchandise necessary to stock the station; that the operator was to devote his entire time to the operation thereof; that a bank account was to be opened in the name of the Company in a bank designated by it; that the operator was to make daily deposits of all receipts in the bank account and was to furnish daily reports of designated, detailed information; that all books and records were to be kept in the Company's office in Hutchinson, and that no obligations were to be incurred except upon express authority of the Company; that credit extended without approval of the Company

BRATTON, Circuit Judge, dissenting.

———◆———

---

[1] Herein called the Company.

was at the risk of the operator; that the operator was to receive a drawing account of from $50 to $100 per month, which was to be charged against one-half of the profits which he was to receive at stated times; that the operator could not dispose of his interest in the business without the approval of the Company. Some of the contracts were for a number of years while others were for an indefinite time. All but one of the contracts were subject to cancellation by either party on written notice of from fifteen to ninety days, except that three could not be canceled until after the first year. Several contracts provided that the operator could purchase the stock and equipment at a price to be fixed by the Company, upon the termination of the contract. All purchase orders were to be issued from the office at Hutchinson. Express authority had to be obtained from the home office before the operator could incur any obligation. The stations were all operated in the Company's name. When one operator quit, there was no distribution of assets, but only a final accounting of the profits. When a new operator took over a station, the license was not canceled, but the new operation was continued under the same license.

Oral testimony was introduced at the trial substantially as follows: All checks on the bank account were supposed to be issued by the Company. The operator could check against the account only in emergency. All bills were paid from the home office of the Company. Small bills were paid by the operator out of petty cash. The Company left the matter of fixing prices to the operator. Orders for merchandise were placed by the operator where the order was less than car-load lots. Car-load lots were ordered through the Company at Hutchinson. The operator determined the character of the stock he would keep. He always hired all the help at the station. Salaries for such help were paid out of the proceeds of the business. Loss resulting from credit was "split fifty-fifty."

■ The trial court made appropriate findings of fact and conclusions of law. It concluded as a matter of law that the relationship between the parties was not one of employer and employee, but was more in the nature of a special partnership or joint adventure. There was no conflict in the evidence. The findings of fact are not in issue, and, being supported by the evidence, are accepted by us. But whether the conclusions of law which the court drew therefrom are correct is a matter concerning which we exercise our own independent judgment.

Appellee took the position that the contracts created a partnership rather than the relation of employer and employee. While the court at the conclusion of the trial expressed grave doubts as to this, it ultimately adopted this theory, as evidenced by its second conclusion of law.

■ Contracts for the rendition of services ordinarily result in one of three general classifications—such contracts may create a partnership, that of an independent contractor, or that of master and servant. It is necessary to consider the relationship created by these contracts because this enables us to determine into which classification they fall. By considering the elements of these three general classifications, we eliminate those that do not fit the facts and thus determine the correct relationship created by the contracts.

■ We cannot agree with the trial court that the contracts created a special partnership or joint adventure. A joint adventure is but one form of a partnership, and for the purpose of this part of the discussion we will speak only of a partnership. A partnership connotes a community of interest. More is required than a community of interest in the fruits of the venture. There must be such interest in the business and also in the management of the business. There must also be joint liability. None of these elements is present here. The Company owned all the assets. It owned the sites, the stations, and all the merchandise. At no time, either during the operation of the business or at the termination of the contract, did the operator have or acquire a vested interest in any of the property used in the business. The privilege which some of the contracts gave the operator to purchase the business upon termination of the contract evidenced no ownership as a partner in such assets, because he could buy them, not at their actual or appraised value, but only at such value as the Company alone chose to place on them. Had he been an employee, he could have done this either during the continuation of the contract or upon its termination, without such a provision in the contract. This provision means no

more than that if the employee wants to buy the business, he may do so, at a valuation which the Company places on it. Neither did the operator have the right to exercise his independent judgment in the management and operation of the business. While there was some oral testimony to the effect that the operator was free from dictation of the Company in the management and operation of the business, when examined in the light of the contracts and of all of the testimony, this right is more fanciful than real. The business was conducted in the name of the Company; the bank account was kept in the name of the Company in a bank designated by it; the checks were written against the account only by the Company and none were written against this account by the operator save that in an emergency he might draw a check against the account. The license for the station was taken in the name of the Company. When the operator terminated his contract, the license of the Company was not surrendered. It continued, and the station was operated under the same license by the new operator, or employee. The operator was required to make detailed, daily reports to Hutchinson. While he could place orders for merchandise less than in car-load lots, all purchase orders were issued from the home office and orders for car-load lots were issued by the Company. He had to procure the approval of the home office before he could incur any obligations. What independent powers of management did this leave him? What could he do that the Company could not veto? The contract did not give him the right to fix prices. The oral testimony was that the Company permitted him to fix prices. Neither did he assume any liability for the debts of the so-called partnership or joint adventure. He did not become liable for merchandise accounts or for other obligations incurred by the Company. The only liability he had was that he shared the net operating losses, if any. But sharing in the profits or losses alone of a business is not sufficient by itself to create a partnership relation.[2] The relationship created by these contracts lacked many of the usual elements necessary to create a partnership, either general or special, in the nature of a joint adventure. We accordingly conclude that no partnership relation existed between the parties.

The next question is, Were the operators independent contractors? In Jones v. Goodson, 10 Cir., 121 F.2d 176, 179, we discussed in detail the elements which distinguish an independent contractor from an employee. We said that: "In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor."

We also said that only a "reasonable measure of direction and control over method and means of performing the service is a constituent element of the relationship of master and servant * * *." Did the Company have a reasonable measure of direction and control over the method and means of conducting the business, or, putting it another way, what could the operator do in shaping the policy or conducting the business independently of or in opposition to the wishes of the Company? From the analysis of the contract requirement as already set out, the conclusion is inescapable that he could do but very little, if anything, in opposition to the wishes of the Company. He could not even write checks on the bank account. As a matter of fact, he did not have a bank account in his name, and while he determined his requirements as to merchandise, this was subject to supervision by the Company because it issued all purchase orders. But it is urged that he fixed prices and determined his working hours. His contract did not give him either of these rights. The testimony and the findings of the court were that as a matter of practice he set his prices, determined his business hours, and ordered replenishing stocks, and was free to engage such additional help as he deemed expedient. But even these privileges were exercised in conjunction with the Company. E. A. Andrews, president of the Company, testified that such matters as "keeping the place in order mainly, and the kind of stock to buy, and the prices which they set, prices to suit their particular trade of their own town," were discussed. He further testified that, "They were on the location. That was one reason. But we talked those things over when it was necessary." Can there be any question as to what would have happened if the Company's sugges-

---

[2] Am.Jur. Vol. 40, Partnership, § 39; C.J., Vol. 47, Partnership [61] d; Weiland v. Sell, 83 Kan. 229, 109 P. 771.

tions concerning these matters had been disregarded? No doubt these privileges, which were not given by the contract, soon would have been withdrawn. In addition, the Company always could enforce its suggestions by the ever-present cancellation clause by which it could cancel the contract by giving notice of from fifteen to ninety days. While it was stressed that the operator fixed his own hours, the contract did not give him this privilege. It required him to devote his entire time to the operation of the business. Can there be any doubt as to what would have happened if the operator had chosen to open the station only from 8 to 10 o'clock each morning, even though such operation resulted in a net profit? The answer is obvious.

█ The Company stresses the fact that it could not discharge the employee at will. But that is not controlling, or even very persuasive. A servant hired for a definite number of years is nonetheless an employee, even though the master is without power to discharge him. Whether the compensation of employees is paid in a fixed sum or in a percentage of the profits is not determinative. We think the true relationship of these operators, when viewed in the light of the entire record, is correctly reflected in the observations of the trial court at the conclusion of the hearing, as follows: "At the same time it looks very much like the ordinary employer and employee relationship too where the employee gets a guaranteed amount per month, which would in effect be the salary that he is paid, and then receives some bonus out of the profits provided there are profits. As a matter of fact, I say to you frankly that at this time I am inclined to believe that that is about what it is. These people were attempted to be hired to run the business; they were given an interest in the profits. The only thing they furnished was the time and labor, which is all they would have furnished had they been paid a salary and nothing more. So that when you analyze this contract and give it a practical construction and consider the evidence as to the manner in which the parties actually operated under the contract, it seems to me that you just about

have a situation where you were paying these employees a salary, these managers, a specified salary referred to in the contract as a 'drawing account,' * * *."

As stated by us in the Goodson case, supra, only a reasonable measure of control over the method and means of performing the services is necessary to create the relationship of employer and employee.

█ We think it is a matter of common knowledge that the manager of local units in a chain organization of necessity is invested with a certain amount of discretion and control in the operation of the local unit. It is doubtful whether the amount of discretion vested in the operators of these individual stations, all of which belonged to the Company, differed materially from that vested in managers of local stations of some of our large oil companies operating throughout the nation, who admittedly are employees. It is undisputable that at the termination of the contract everything belonged to the Company. It still owned the site, the building, and the stock of merchandise. The operator stepped out without anything except the salary which his labor had earned.

There is a line of cases, known as the "Bulk Sales Cases",[3] in which the Circuit Courts have uniformly held that the operators or distributors of bulk stations were independent contractors and not employees. We are in full accord with the decisions in each of these cases, but we think they are clearly distinguishable upon the facts from the case here in question, as a careful reading thereof will reveal. In the Texas Co. v. Higgins case, the company entered into a contract with the operator in which the operator agreed to distribute the company's petroleum products, which were shipped to him on consignment, and were charged to him on the books of the company at a fixed price. He furnished all his own equipment, such as tanks and trucks, hired the drivers, paid their wages, and assumed full responsibility for them. As the products were sold he remitted the full price thereof to the company and received from the company his stipulated commissions. He erected and owned two bulk stations which he used in connection with the business. He conducted both sta-

---

[3] See Texas Co. v. Higgins, 2 Cir., 118 F.2d 636; American Oil Co. v. Fly, 5 Cir., 135 F.2d 491, 147 A.L.R. 824; Glenn v. Standard Oil Co., 6 Cir., 148 F.2d 51; Indian Refining Co. v. Dallman, D.C., 31 F.Supp. 455, affirmed 7 Cir., 119 F.2d 417; Orange State Oil Co. v. Fahs, D.C., 52 F.Supp. 509, affirmed 5 Cir., 130 F.2d 743.

tions in his own name, had his own bank account, paid social security taxes on his employees, and did local advertising in his own name. He had more than $60,000 invested in the business. In addition to this business, he carried on many other activities.

In the Glenn v. Standard Oil Co. case, the operators likewise were in charge of bulk stations and distributed the company's products on a commission basis. In this case, the company owned the stations and the storage tanks thereon. All products were consigned to the operator and remained the property of the company. The full cash receipts were deposited in a bank in the company's name and the company would thereafter remit commissions to the agents at regular intervals. The agents purchased their own trucks, provided their own office space and equipment. The company had nothing to say about the persons employed by the operators to drive the trucks. Their salaries were paid by the operator. Hours of work for the drivers, their compensation, periods of vacation, and rules respecting their employment, were all determined by the operator alone. The operators all had substantial sums invested in equipment employed in the business, ranging from $2,000 to $60,000. Their commissions varied from small sums to as much as $31,000 per year. There was no requirement as to the amount of time the operators were to devote to the business. Some devoted all their time to the business, while others gave it merely supervisory attention and spent most of their time supervising other businesses. They kept their own books, paid their own expenses, and hired and discharged their own employees. The company merely looked to each operator for a satisfactory volume of sales and so long as the results were satisfactory, the relationship continued. We have merely sketched some of the more pronounced distinguishing elements in these two cases. To analyze the facts in each of the other cases, even in these general terms, would extend this opinion to undue lengths. In the main, their pattern is the same. In all of them the facts reveal an independent business carried on by the operator in which he had a proprietary interest and in which he had substantial sums invested of his own. As stated by the Sixth Circuit in the Glenn case, the company looked to each operator for a satisfactory volume of sales. How he brought it about was his own concern. The company in the main did not concern itself with how he conducted his business so long as the results were satisfactory.

[11] Numerous other cases are cited by the parties to support their respective contentions. It would serve no useful purpose to analyze each of these cases in detail. In defining the relationship between the parties in a given instance for the purpose of determining the applicability of the Act, decided cases are of help only insofar as they point out the broad general principles which must guide us in seeking the answer. Very rarely are they controlling, because each case must stand on its own peculiar facts and these generally differ in each case.

 It is our conclusion that the undisputed evidence reveals such residuum of control in the company over the operation of the business as makes the operator of the individual stations an employee within the provisions of the Act.

The judgment of the court is accordingly reversed and the cause is remanded, with directions to proceed in conformity with the views expressed herein.

BRATTON, Circuit Judge (dissenting)

I think the controlling facts and circumstances in this case considered in their totality, are indistinguishably similar in effect to those appearing in American Oil Co. v. Fly, 5 Cir., 135 F.2d 491, 147 A.L.R. 824, and Glenn v. Standard Oil Co., 6 Cir., 148 F.2d 51. And whether the company and the operators of the filling stations were partners or members of a joint venture, it seems reasonably clear to me that the relationship between them was not that of employer and employee, within the meaning of the Social Security Act, as amended, 49 Stat. 620, 639, 42 U.S.C.A. § 1101 et seq. American Oil Co. v. Fly, supra; Glenn v. Standard Oil Co., supra. It is my view that the judgment should be affirmed.