## DE-RAEF CORPORATION v. UNITED STATES.

### No. 46025.

Court of Claims.

March 3, 1947.

MADDEN, Judge, dissenting.

———◆———

Temple W. Seay, of Washington, D. C. (Morelock & Seay, of Washington, D. C., Joseph A. Hoskins, of Kansas City, Mo., and Phil D. Morelock, of Washington, D. C., on the brief), for plaintiff.

John A. Rees, of Washington, D. C., and Sewall Key, Acting Asst. Atty. Gen. (A. F. Prescott and Andrew D. Sharpe, both of Washington, D. C., on the brief), for defendant.

The facts necessary to a decision of the case are set out in the opinion; they are set out more in detail in the following

### Special Findings of Fact

1. Plaintiff is and at all times material to this action was a corporation organized and incorporated under the laws of the State of Missouri with its offices and principal place of business in Kansas City. Plaintiff owned three United States Letters Patent: (1) No. 1,504,303 issued August 12, 1924, for "Scale"; (2) No. 1,578,-591 issued March 30, 1926, for "Art of Making Ice Cream"; (3) No. 1,935,596 issued November 14, 1935, for "Method of Increasing the Food Value of Frozen Comestibles".

2. During the years 1939, 1940 and 1941, plaintiff manufactured and sold under its own label and trademark products known as De-Raef, Pro-Lac, De-Raef Minsol and De-Raef Standardizers. Minsol is an ice cream mix composed principally of anhydrous dextrose and the principal minerals found in milk. Its use enables ice cream manufacturers to standardize the acid content of their product and to increase the solids in ice cream to a greater degree than was formerly known to the trade. The use of Minsol eliminates crystallization or what is generally known as a "sandy" ice cream. Pro-Lac is a milk powder used in the manufacture of ice cream and has essentially the same properties as Minsol. Plaintiff's standardizer is a scale developed for measuring the weight per gallon of ice cream. Its use standardizes the process of manufacturing ice cream, thereby improving its quality.

3. On January 1, 1939, and again on January 1, 1940, plaintiff, who was designated as licensor, entered into written contracts with Walter L. Murphy, Jr., who was designated as licensee, for the years 1939 and 1940, by the terms of which Murphy was licensed to market the products of plaintiff under the letters patent owned by plaintiff within a designated territory and in accordance with the provisions of the licensing agreement. Similar agreements, each covering a period of 12 months, were entered into between plaintiff and John R. Idoux on April 1, 1939 and March 1, 1940 and between plaintiff and H. Paul Vasterling on January 1, 1939 and April 1, 1940. On October 2, 1939, a contract of the same nature, between plaintiff as licensor and Harry L. Younger as licensee, was prepared with the intention that it be executed by both parties. It was never signed but Younger orally agreed to and did actually operate under and according to the terms thereof for the period of time that he was licensed to sell plaintiff's products. The license agreements referred to are in evidence as exhibits D to I inclusive and are made a part hereof by this reference. For convenience, Murphy, Idoux, Vasterling, and Younger will be referred to hereinafter as licensees.

4. Under each of the contracts referred to above, plaintiff authorized the licensee to offer its products for sale in a specified territory and in the original packages to be shipped by plaintiff. The license was granted upon the following conditions:

(a) that licensee would procure bona fide orders for stated quantities of Minsol and Pro-Lac to be shipped by plaintiff during the calendar year covered by the contract;

(b) that all orders received by the licensee would be promptly transmitted to plaintiff;

(c) that licensee would sell plaintiff's products under the name, label and trademark designations established by plaintiff;

(d) that the licensee would not use any advertising matter or product designation in the sale of plaintiff's products without written approval from plaintiff;

(e) that the licensee would not infringe or dispute the validity of plaintiff's patents;

(f) that licensee would not assign his license without prior written consent of plaintiff;

(g) that licensee would not sell or offer for sale any products of plaintiff outside the territory granted to licensee;

(h) that licensee would devote his entire time to the sale of plaintiff's products;

(i) that licensee would procure orders from customers for a specified percentage of his annual sales quota during each month of the calendar year;

(j) that all orders taken by the licensee would be subject to approval as to credits by plaintiff at its home office before shipment of the merchandise; and

(k) that the licensee would furnish plaintiff each working day a report of plants visited and each week a statement of expenses incurred, as well as reports on demonstrations of plaintiff's products.

266

It was provided that the license would terminate upon the occurrence of either of the following:

(1) the expiration of 20 days after written notice given by the licensee to plaintiff, stating an election to terminate; or

(2) the expiration of the contract or any renewal thereof; or

(3) a breach by licensee of any one of the conditions set out in the contract and after written notice given by plaintiff to licensee, stating an election to terminate the license in not less than 20 days after the date of notice.

5. In addition to the foregoing, each agreement provided that the products of licensor would be offered for sale by licensee at the prices stated in the contract, except as these were changed from time to time by licensor; that on all sales licensee would receive a specified commission to be credited to his account on the books of licensor as the same accrued; that all orders shipped into licensee's territory would be deemed to have been procured by him and that commissions would be payable thereon; that in case of bad accounts for merchandise shipped, the commission credited to licensee for the order would be charged back to his account; and that in order to prevent such bad accounts, the licensee would use his best efforts to aid in the collection of accounts in arrears upon notice from licensor that such accounts were delinquent.

6. Provision was made in each license agreement for the reimbursement by licensor of necessary travel expenses incurred by licensee in performing the contract in his allotted territory. It was agreed that licensee would submit a weekly report of such expenses, which when approved by licensor, were to be paid out of a stated sum which licensor contracted to advance to licensee each week. All funds so advanced were to be charged on licensor's books to licensee's account, which was also to be credited with commissions earned. The parties agreed that at the end of the calendar year or other termination of the license, an accounting would be made and

the licensee would be paid the net amount due him as shown on the books.

7. Plaintiff also sold its products through distributors located in Atlanta, Georgia; Pittsburgh, Pennsylvania; Temple, Texas; on the Pacific Coast, and in Canada. Plaintiff shipped merchandise directly to the distributors who carried their own stocks, sold the goods in their respective territories and made their own collections.

8. Exclusive of the four licensees, namely, Murphy, Vasterling, Idoux, and Younger, plaintiff had seven employees during each of the years 1939, 1940, and 1941, and no others. Included among the seven employees were the president and vice president of plaintiff.

9. The four licensees were selected on the basis of their previous selling experience, their familiarity with the manufacture of ice cream, and their responsibility and moral character. Before they were licensed by plaintiff to sell its products, Murphy and Idoux had a period of training in an independent milk plant, not associated with plaintiff, in order to familiarize themselves with the manufacture of ice cream in which plaintiff's products were used. The training was conducted at their own expense and without any supervision or control by plaintiff. Vasterling and Younger had been selling merchandise to the dairy industry for several years before they entered into the contracts with plaintiff, and it was considered that their experience qualified them to become licensees of plaintiff without further training.

10. Murphy was first licensed by plaintiff in 1934, Vasterling in 1938, Idoux in 1938, and Younger in 1939. Younger's contract was terminated by plaintiff in June 1940 because the amount of his sales was unsatisfactory.

11. Pursuant to the contracts entered into with plaintiff, licensees sold plaintiff's products under its firm name and trademarks in the territories allotted to them. On a few occasions they wrote letters to the customers, but 95 percent of their sales, with the exception of repeat orders, were obtained by personal solicitation of former

and prospective customers. They travelled in their own automobiles, except Vasterling who used his privately owned airplane for that purpose, and each paid all expenses incurred in the operation. Plaintiff supplied them with a small model of its standardizer, certain equipment for making acidity tests of ice cream, and a pad of mixing room reports, all of which were the property of and returnable to plaintiff. They made demonstrations of plaintiff's products and gave advice and assistance on the proper use of such products to old and new customers. The mixing room reports were forms upon which the licensees tabulated the correct proportions of the various ingredients that were necessary to provide a balanced ice cream mix for their customers.

12. The plaintiff also distributed to its licensees and to the trade, a loose-leaf manual, which was supplemented from time to time with other literature. This literature contained a history of the DeRaef Products, instructions on the use of such products in various phases of dairy manufacturing, and several brochures written by professors from the Dairy Departments of the University of Missouri and the Ontario Agricultural College. The latter were of a scientific and technical nature and related to the preparation of ice cream mixes, the manufacture of ice cream and cottage cheese, and the processing of cultured buttermilk. Also included in the manual were some general articles on salesmanship. Some of these were written by executives of the distributing concerns handling plaintiff's goods and some were contributed by the licensees themselves. The twofold purpose of the manual and other literature was to instruct the licensees and plaintiff's customers on the proper use of plaintiff's products and to acquaint them with new and current developments in the dairy industry. The literature did not contain any instructions, regulations or directions as to the manner in which licensees' selling activities should be conducted.

13. The licensees determined what their itineraries would be, were free to travel at will in their respective territories, and established their own working hours. Their homes were their business headquarters, and plaintiff did not supply them with office space, office equipment or telephone service.

14. All orders received by the licensees were sent in to plaintiff, who made shipments directly to the customers and mailed out bills for all accounts due. All orders received were subject to rejection by plaintiff if in its judgment an extension of credit was not warranted. Each licensee was obligated to use his best efforts to aid in the collection of accounts in arrears and received no commission on a sale which resulted in a bad debt. When an account became delinquent, plaintiff sent a copy of the bill to the licensee in whose territory the sale was made. There were no accompanying instructions, but it was understood that the licensee would call on the customer and attempt collection of the account at the first opportunity.

15. Although their contracts required them to furnish plaintiff a statement of their travel expenses weekly as a prerequisite to receiving the stipulated advance of funds from plaintiff, none of the licensees ever submitted an expense report. Plaintiff did not know what they spent and made no effort to obtain the reports or to keep records of such expenses. The licensees regularly drew from plaintiff the funds provided for in the agreements, and the amounts advanced were charged against their respective accounts. Each month, statements of their accounts were made up and they were paid the net amounts then due, but there was no final settlement between the parties until the close of the year.

16. The contracts provided that licensees would, on each working day, furnish licensor reports of plants visited but such reports were not submitted daily or at other regular intervals. In actual practice, the licensees sent a separate report on each plant visited. In most instances, such reports were made only if the owner was a new customer. The report showed the customer's name, the amount of plaintiff's products sold, what literature of plaintiff's was distributed to the customer, and

whether or not a demonstration was to be made by the licensee.

17. The licensees did not comply with the provision in the agreements which required them to produce a designated percentage of their annual quota of sales during each month of the calendar year. The selling season for plaintiff's products ran from about May 1 to October 1 in each year. The men worked full time during these months and if they obtained their annual quota of sales, plaintiff considered that they had met the requirement of their contracts in that respect.

18. The license agreements required the licensees to devote their entire time to the sale of plaintiff's products, but each of them was engaged in other business activities with the full knowledge of and without any objection on the part of plaintiff. Vasterling was a copartner in a retail ice cream business in Racine, Wisconsin, and spent from 10 to 15 percent of his time in the management and supervision of that business. Idoux devoted about five percent of his time to the sale of building materials. Murphy owned a machine shop in Kansas City and during the winter months devoted most of his time to personal supervision of work in the shop. During all of the time that he operated under the license from plaintiff, Younger was also engaged in selling merchandise of other manufacturers.

19. Plaintiff did not control or supervise the means or methods by which the licensees conducted sales of its products and provided no facilities for exercising such supervision or control. No supervisors were sent into the territories travelled by licensees for the purpose of directing them as to when or how sales should be made. Except for the license agreements, plaintiff issued no written or other instructions for regulating or directing the selling activities of the licensees. Plaintiff was concerned primarily with the volume of sales made and not with the manner by which that result was accomplished. In view of their previous training and experience, both licensees and plaintiff felt that they were qualified to perform the obligations in their contracts without any other aid or instructions from plaintiff.

Usually when a prospective customer made inquiry regarding plaintiff's products, a copy of the inquiry, together with a covering letter, was sent to the licensee concerned without further instructions. It was understood that the licensee would call on the prospect, but it was left to his discretion to determine when the visit would be made.

The licensees were at liberty to call on the officials at the home office for advice and assistance, but they rarely visited plaintiff's office during the summer months. Two of them lived in Kansas City and, during the winter, they were in plaintiff's office as often as once a week. Vasterling's headquarters were in another city and he did not call at plaintiff's office more than two or three times a year. Younger, whose contract was terminated, was never in plaintiff's office after he became licensed. Visits to the home office were voluntary on the part of licensees and for the most part were made to collect their commissions. Business matters, particularly potential sales, were sometimes discussed but there were no periodic conferences or other regular business meetings with plaintiff. Generally, once a year during the winter months a meeting was held in Kansas City at which time plaintiff provided a dinner and other entertainment for the licensees. These gatherings were primarily of a social nature and their purpose was to promote good fellowship and cooperation among the licensees.

20. Under claim that plaintiff was an employer within the meaning of section 1607(a) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1607(a), in that it had "eight or more" employees and consequently was subject to the provisions of the Federal Unemployment Tax Act during the years 1939, 1940, and 1941, defendant made demand on plaintiff for the taxes, penalty, and interest imposed by such Act. On July 25, 1942, the Collector of Internal Revenue for plaintiff's district ruled that the contract between plaintiff and Walter L. Murphy, Jr., which was typical of the written agreements entered into by plaintiff with Vasterling, Idoux, and Younger, created the relationship of employer and employee and that Murphy

was not an independent contractor as believed by plaintiff. Therefore, plaintiff prepared and filed Federal tax returns reporting tax, penalty, and interest aggregating $2,946.35 which plaintiff paid to the Collector of Internal Revenue on November 23, 1942, for the years and in amounts as follows:

| Year | Tax | Penalty | Interest | Total |
|------|-----|---------|----------|-------|
| 1939...... | $755.65 | $188.91 | $125.92 | $1,070.48 |
| 1940...... | 749.92 | 187.48 | 79.97 | 1,017.37 |
| 1941...... | 662.10 | 165.52 | 30.88 | 858.50 |

21. Thereafter, on June 15, 1943, the plaintiff duly prepared and filed with the Collector of Internal Revenue, Sixth District of Missouri, claims for refund on Form 843 for said years, asking refund of the aforesaid amounts on grounds which were stated as follows:

1. It is not an "employer" within the meaning of Sec. 1607(a), I.R.C., for the reason that the total number of persons employed by it was not "eight or more" as therein prescribed.

2. The greatest number of persons employed by it during the taxable year within the meaning of Sec. 1607(a), I.R.C. was seven.

3. Walter L. Murphy, H. Paul Vasterling, John R. Idoux and Harrell L. Younger were not "employees" within the meaning of that word as used in Sec. 1607, I.R.C., and were not in the "employment" of the claimant within the meaning of that term as defined in sub-paragraph (c) of that Section.

4. The said Walter L. Murphy, H. Paul Vasterling, John R. Idoux and Harrell L. Younger were independent contractors operating in pursuance of written contracts entered into with the claimant by which they were licensed by it, owner of certain patents, to market the products manufactured under said patents in certain specified territory, but under which they were not, either by the terms of the contracts themselves, or in fact, subject to the control of the claimant over the means or methods used by them to accomplish the results sought thereunder.

22. Upon examination and consideration of said claims by the Commissioner of Internal Revenue, they were disallowed and notice of such disallowance was sent to the plaintiff by registered mail on November 4, 1943, and refund of the said amounts claimed was denied.

23. The amount of $2,946.35 paid by the plaintiff as aforesaid to the United States Collector of Internal Revenue for the District of Missouri was thereafter turned over by him and deposited in the Treasury of the United States in the regular course of business.

WHITAKER, Judge.

Plaintiff sues to recover taxes alleged to have been wrongfully collected from it under Title IX of the Social Security Act, 49 Stat. 620, 639, 26 U.S.C.A. Int.Rev. Code, § 1600 et seq., which levies a tax on the employer of eight or more persons. In order for plaintiff to be such an employer one of four of its so-called "licensees", in reality commission salesmen, must have been its employee. Plaintiff says they were not employees, but independent contractors.

An employer is defined by the Act as one who has in his "employ" eight or more persons. Section 907(c) of the Act provides: "The term 'employment' means any service, of whatever nature, performed within the United States by an employee for his employer, except— * * *." 26 U.S.C.A. Int.Rev.Code, § 1607(c). An employee is not otherwise defined.

We must construe the meaning of the word, of course, in such a way as to give effect to the purpose of the Act. National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170. The purpose in the enactment of Title IX of the Act was to provide a fund for the relief of persons thrown out of employment.

In the broadest sense of the word anyone who performs services for another is an employee, pro tempore at least, and conceivably could come within the purpose of Congress. One employs a physician, a lawyer, a contractor; but it is commonly

recognized that such people were not in the mind of Congress. Congress certainly had in mind the common laborer working for a daily wage, but it also had in mind the skilled artizan, as well. How far up the scale did it intend to go? No one can say with assurance.

■ It hardly seems necessary, however, for us to speculate. The Act gave the Secretary of the Treasury the power to make regulations to carry out the Act, and such regulations which are within the general scope of the Act and are reasonably adapted to its enforcement have the force and effect of law. United States v. 200 Barrels of Whiskey, 95 U.S. 571, 24 L.Ed. 491; Maryland Casualty Co. v. United States, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297; Campbell v. Galeno Chemical Co., 281 U.S. 599, 610, 50 S.Ct. 412, 74 L.Ed. 1063; International Railway Co. v. Davidson, 257 U.S. 506, 514, 42 S.Ct. 179, 66 L.Ed. 341. Pursuant to this power, the Secretary of the Treasury promulgated Regulations 90, in which he adopted the common law distinction between an employee and an independent contractor. In pertinent part it reads:

Whether the relationship of employer and employee exists, will in doubtful cases be determined upon an examination of the particular facts of each case.

Generally, the relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services.

In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor, not an employee.

■ Our inquiry, then, is confined to determining whether plaintiff had the right to regulate and control the details and means by which these salesmen should accomplish the sale of its products. If it did, they were employees. If it did not, but was interested only in the results accomplished, and not in the means by which they were accomplished, they were independent contractors, and not within the terms of the Act.

Plaintiff entered into written contracts with these men for the sale of its patented products. All the contracts were substantially the same. They denominated the salesmen as "licensees." Under the contracts they were given the right to sell plaintiff's products at a stipulated price within a certain territory during the life of the contracts. They agreed to sell a certain amount each year, but they were free to work when they pleased and where they pleased, so long as it was within their territory. They furnished their own transportation, but plaintiff reimbursed them for expenses incurred. The contracts provided they should sell a certain percentage of their yearly quota each month and should devote their entire time to the work, but both of these provisions were disregarded by common consent. All of them were interested in other enterprises. One was a partner in a retail ice cream business; another had a machine shop; and the other two sold other merchandise.

No supervision was exercised by plaintiff over the methods employed in making the sales; nor did it have any facilities for doing so. The commissioner of this court so found, and the parties have taken no exception to the finding. The contracts did provide that they would make daily reports of plants visited and demonstrations made of plaintiff's products, but this was rarely done except in the case of a new customer. No provision was made for cancelling the contracts or otherwise dis-

ciplining the salesmen if these reports were unsatisfactory. The commissioner found, to which no exception was taken: * * * The men worked full time during these months and if they obtained their annual quota of sales, plaintiff considered that they had met the requirement of their contracts in that respect.

* * * * * *

Plaintiff was concerned primarily with the volume of sales made and not with the manner by which that result was accomplished. In view of their previous training and experience, both licensees and plaintiff felt that they were qualified to perform the obligations in their contracts without any other aid or instructions from plaintiff.

Plaintiff did send these salesmen a loose-leaf manual which contained articles on various phases of dairy manufacturing, and on salesmanship, some written by the salesmen themselves or by distributors of plaintiff's products, but this "literature," quoting again from the commissioner's report, unexcepted to, "did not contain any instructions, regulations or directions as to the manner in which licensees' selling activities should be conducted."

The contracts contained no provision for supervision and control over the manner of making the sales and none were in fact exercised. We are, accordingly, of the opinion that, applying the test laid down by the Secretary's regulations, these men were not employees in the sense of the Act, but independent contractors.

This view will be found to be in harmony with that of the Second Circuit Court of Appeals in McGowan v. Lazeroff, 148 F.2d 512, and in Texas Co. v. Higgins, 118 F.2d 636, and in Radio City Music Hall Corp. v. United States, 135 F.2d 715; and with that of the Fifth Circuit in American Oil Co. v. Fly, 135 F.2d 491, 147 A.L.R. 824; and with that of the Sixth Circuit in Glenn v. Beard, 141 F.2d 376, and in Glenn v. Standard Oil Co., 148 F.2d 51. See also decision of Fourth Circuit in Magruder v. Yellow Cab Co., of D.C., 141 F.2d 324, 152 A.L.R. 516. The facts in all these cases differ from those at bar, but the same test is applied in all of them.

We are of opinion the tax was erroneously assessed and collected, and that the plaintiff is entitled to recover. Judgment will be entered against the defendant in the sum of $2,946.35, and interest as allowed by law. It is so ordered.

JONES and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting).

I think that the four persons whose status is here in question were employees of the plaintiff, within the meaning of the statutes here involved. They travelled about selling the plaintiff's product on the plaintiff's account. They worked under contracts which seem to me to contain the provisions usually found in contracts of travelling sales agents. I find nothing at all in those contracts except the word "licensee" which even tends to indicate any relation except that of agency. Of course, the label which the contract applies to them cannot have any effect upon the legal status created by the contract.

The Government urges the application of the doctrine of National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, that one should look at the purpose of the statute to determine whether or not a person in question is an employee within the meaning of the statute in question. I think that there is no occasion here to resort to that doctrine, as these four persons seem to me to have been employees, or agents, for all the purposes which occur to me. For example, I would have no doubt that if one of them suffered an injury while he was selling the plaintiff's product, he would have the benefit of the usual workmen's compensation statute, or that if one of them negligently injured a person on a highway while he was driving his automobile to visit a customer, the plaintiff would be liable as a principal.

The fact that the men used their own vehicles is not of importance. Many employees in the higher skills, such as carpenters, bricklayers and plumbers, use their own tools.

The practice of the plaintiff of refraining from giving directions as to details

was, I think, no more than the normal practice with regard to employees of considerable standing and dignity. The contract itself, gave detailed directions as to prompt transmission of orders, advertising methods, the time to be devoted to the work, the intensity of the work, that is, the amount of sales which had to be produced each month, and the furnishing to the plaintiff of daily and weekly reports. In addition, by the necessary implications of the contract, any conduct or method of work harmful to the plaintiff's interests would have been a breach of contract and a cause for discharge unless, upon request, the method had been changed. I see no lack of authority to direct the details of the work in any regard in which an employer would, ordinarily, desire to direct the details of work such as that here involved. It is said that in fact the plaintiff did not insist upon the performance of the contract as written. That may well have amounted to a waiver, so that the plaintiff could not have discharged the men for breach of contract, but the plaintiff could have, by notice, required the immediate resumption of the agreed practices. I think that a nonexercise of a right of control cannot be regarded as a determining factor. If it could, status would change from time to time and legal rules would be difficult to apply.

If it were necessary to resort to the teaching of the case of National Labor Relations Board v. Hearst Publications, I think that resort should be made. The benefits of the Social Security Act were, for reasons of administration, limited with a good deal of reluctance, to only a part of the population which might, on the basis of similar need for protection, have been covered by it. I think that its present coverage should not be limited by narrow interpretations of its definitions. Here, not only the four men in question, but five others, admittedly working people with all the need for the protection of the Act which any other workmen have, are deprived of the protection of the Act by the Court's interpretation.

WHALEY, Chief Justice, took no part in the decision in this case.