**SPIRELLA CO., Inc., v. McGOWAN, Collector of Internal Revenue.**

No. 1334.

District Court, W. D. New York.

Sept. 23, 1943.

Franchot, Runals, Cohen, Taylor & Rickert, of Niagara Falls, N. Y. (Paul P. Cohen and Edward E. Franchot, both of Niagara Falls, N. Y., of counsel), for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe and John W. Fisher, Sp. Assts. to the Atty. Gen. (George L. Grobe, U. S. Atty. and Eugene J. Donnelly, Asst. U. S. Atty., both of Buffalo, N. Y., of counsel), for defendant.

KNIGHT, District Judge.

Plaintiff brings this action for refund of taxes in the amount of $20,744.80 and interest assessed against plaintiff under subdivision C of Chapter 9 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code § 1600 et seq. (the Federal Unemployment Tax Act); the Collector having levied the assessment on the basis that some 4,000 individuals (called "corsetieres") throughout this country engaged in selling plaintiff's garments were "employees" under the Act and having computed the tax on the basis that the "total wages" paid to each equalled a fixed percentage of the price charged by the plaintiff to the corsetieres for each garment. This figure (60%) was determined by computing the percentage markup of the plaintiff's "recommended retail price" over the price charged to the corsetieres.

The issues presented are, first, whether or not the corsetieres are "employees", and,

second, if they are so, whether or not the method of computing the tax was proper.

The evidence shows that over a long period of years the plaintiff has been manufacturing women's underclothing, referred to as "foundation garments", which to some extent are made to the measure of the individual customer, throughout the country. Plaintiff's garments reached the consumer via the corsetieres with whose status our concern is at present. The corsetiere is a woman who sells plaintiff's garments in her own community by individual solicitation.

The evidence is undisputed that during the year in question, 1941, there were three types of written contracts in existence between the plaintiff and the various corsetieres. These are designated as "old", "intermediate" and "current" contracts. The first-mentioned was the form used prior to 1940; the second, in 1940 and 1941; and the last, in 1941. In 1941, 4,-341 contracts were in force. Of these, 93 were of the "old" form; 360 of the "intermediate"; and 3,888 of the "current" form. Out of the total sales in 1941, amounting to $1,089,413, only $2,702, or approximately one-fourth of one percent, was received from sales made under the "old" contract.

Under each of these several types of contracts, the company grants the right to the corsetiere to sell its product, agrees to protect her sole rights in a definite territory, to provide her with the use of special designated patented modeling garments for use in the making of measurements. The corsetiere on her part agrees not to sell plaintiff's garments outside of specified territory, to pay promptly for all garments received and to deliver up the modeling garment or garments on the termination of the contract. The time and condition of termination are fixed.

The "old" type of contract in addition required the corsetiere to take and practice certain training furnished by the plaintiff, to keep on hand complete modeling garments and representative assortment of models, to furnish the names and addresses of consumers, to sell no competitors' products, and to keep within a certain territory.

A great deal of testimony was given by officers of the company and numerous corsetieres as to the practices and methods of the company and the corsetieres in carrying out the business of sales. There is little material contradiction in this testimony. The company has no dealings with the consumer. Its garments in different styles are entirely sold by the corsetieres. These corsetieres are mostly, if not entirely, women in the homes wishing to engage in remunerative work in hours and times at their own election and at own convenience. The company furnishes certain descriptive matter and offers means for some instruction in the work. Training through means provided by the company is now optional, but, as seen, it was once required. The corsetiere is furnished with a modeling garment for use in taking measurements, and she makes a deposit for the value of this. It is quite obvious that these women require some instruction in some way, especially as to the methods of sale, and to some extent as to the taking of measurements. The modeling garment is specially adapted to show her how to make necessary measurements. The corsetiere procures sales at her own expense and through the methods usually employed in retail sales outside of retail stores. The approach to the customer is reached by house to house canvass, through personal acquaintance, by indirect contact through others, through acquaintance and other ways. The company recommends a minimum sales price but she is not required to observe this, and the evidence discloses that sales are frequently made for less or more than the recommended price. Whether or not the purchaser pays the purchase price at time of sale, the corsetiere must take care of the purchase and pay for garment by order when delivered or else provide a guarantee of payment. Some times the purchase price accompanies the order; at times the garment is paid for on delivery; and at times the payment is made from a deposit theretofore provided by the corsetiere. Approximately 95% of all the sales in 1941 were paid for in full at wholesale price upon or before the delivery of the garments to the corsetieres. The company has never required any report of the price for which any garment was sold. The garments are shipped in all cases to the corsetiere, except on the corsetiere's request they may be shipped to the consumer.

The corsetiere is liable for misfits caused by her own fault; the company is liable for defect in quality or error in making. Expenses of sales are borne by the corsetieres. Prior to 1940 the practice was to invite the filing of business analysis cards by the cor-

setiere with the company. These cards showed what contacts had been made and what results were obtained. They also contained a blank to provide information for advertising by the company. The purpose of this was that the company could study the cards in order to be of assistance and advice to the corsetiere. It appears that only about 25% of these cards were turned in, and this practice was abandoned. Changes in the contract since 1939 are claimed to have been made because of decisions in earlier cases, and the desire to lean over backwards in order to express the true relation between the company and the corsetiere and the operation to the retailer.

The testimony discloses that there is no such a thing as a Spirella method of salesmanship, as distinguished from other methods of salesmanship used in house to house or nonstore selling. Spirella literature as to these methods shows it to be in common use in a comparable type of business. It is some times called personal selling method or direct selling method. The modeling garments are an invention of the Spirella Company. They have been in use since 1929. The so-called Spirella method of corsetry is the means for the use of these modeling garments to obtain measurements and specifications.

With respect to the "intermediate" and "current" type of contract, the terms and performances under them both show that the plaintiff had the right to exercise less control over the corsetieres than under the other contract. For this reason this opinion deals specifically only with the "old" contract though necessarily it applies to the later types.

On the issue of employment, the pertinent statute and regulation are as follows:

Internal Revenue Code, § 1607, 26 U.S.C.A. Int.Rev.Code, § 1607:

"Definitions. * * * (c) Employment. The term 'employment' means any service performed prior to January 1, 1940, which was employment as defined in this section prior to such date, and any service, of whatever nature, performed after December 31, 1939, within the United States by an employee for the person employing him, irrespective of the citizenship or residence of either, except [certain not pertinent exceptions]".

Treasury Regulation 107, Section 403.204:

"Who are employees.—Every individual is an employee if the relationship between him and the person for whom he performs services is the legal relationship of employer and employee. * * *

"Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee. * * *

"Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case. * * * *"

Internal Revenue Code, § 1426 (b), 26 U.S.C.A. Int.Rev.Code, § 1426 (b), Federal Insurance Contributions Act, and Treasury Regulation 106, § 402.204 under it, for all present purposes, define "employment" identically with the above. The requirement of deductions to be made by the employer from the employees' wages under the Federal Insurance Contributions Act, however, sheds significant light on the problem herein.

It has been stated by the Circuit Court of Appeals for this Circuit that the statutory definition does not enlarge the meaning of "employment" beyond that of the common law definition. Texas Co. v. Higgins, D.C., 32 F.Supp. 428, affirmed, 2 Cir., 118 F.2d 636, 638; Radio City Music Hall Corp. v. United States, 2 Cir., 135 F.

2d 715, 717. In the latter case the opinion by Judge Hand states: "We accept Article 3 of Regulations 91 [now Sec. 403.204 of Regulation 107] as an authoritative definition of the distinction between an 'employee' and an 'independent contractor'; it is really no more than a gloss upon the definition contained in Justice Gray's opinion in Singer Manufacturing Co. v. Rahn, 132 U.S. 518, 523, 10 S.Ct. 175, 33 L.Ed. 440. * * * The test lies in the degree to which the principal may intervene to control the details of the agent's performance; and that in the end is all that can be said, though the regulation redundantly elaborated it. * * * "

Judge Hand again writing in Texas Co. v. Higgins, supra, [118 F.2d 638] said: "Were the question presented to us for the first time, we should have no doubt that Thomas and his assistants were not 'employees' of the plaintiff; the act appears to take over the term as the common law knew it, and at common law they would not be employees. The regulation is in harmony with this assumption, for it enumerates the generally accredited determinants in such cases, of which the most important is the putative employer's control over the employee's business."

█ The defendant relies, in support of the assessment, on the case of Matter of Morton, 1940, 284 N.Y. 167, 30 N.E.2d 369, which involved precisely the same written contract as the one presented herein. The Morton case was a review of the New York State Department of Labor proceedings to determine the status of a former corsetiere of the plaintiff during the year 1937 and her rights to insurance benefits under the New York State Act. The evidence adduced by the referee and the "Appeal Board" was held to be sufficient in law to support a finding of fact that the claimant was an employee. While the written contract was identical with the type of contract to which this opinion is directed, the evidence as to the external facts differs materially. In the Morton case, the claimant testified that a representative of the plaintiff required her to attend certain bi-weekly meetings for instruction, and to make weekly reports on the amount of time spent in selling and also accompanied her in selling in order to make constructive criticism of her selling methods. While the plaintiff's representatives testifying in the proceeding denied these controls, the referee and the

"appeal board" of the Department of Labor found that the claimant was an "employee." According to Section 534 of the Labor Law of New York, Consol.Laws N. Y. c. 31, such findings are final provided there is any substantial evidence as a basis. Stork Restaurant, Inc., v. Boland, 1940, 282 N.Y. 256, 273, 26 N.E.2d 247. Matter of Morton, supra, is, thus, an authority that the evidence was sufficient to support the determination of the referee and the "appeal board", and that is all the case purports to hold. The Court there said [284 N.Y. 167, 30 N.E.2d 370]: "The question to be reviewed by us is not whether claimant was an employee of respondent as a matter of fact, but whether upon the basis of the record before us we must decide as a matter of law that claimant was not an employee." It is unnecessary to state herein whether or not on the record of the Morton case I would find that the claimant therein was an employee. It is sufficient to note that there is nothing in the record before me concerning the year 1941 to support an inference that the plaintiff exercised any control over the time spent by the corsetieres in selling, or required or received any reports on the same, or required any presence at meetings, weekly or biweekly, or required a representative to accompany and "coach" on sales. On the contrary, the evidence introduced by both parties to this action shows a complete laissez-faire attitude of the plaintiff towards any direction or control of corsetieres.

█ The defendant contends that the written contract gives a sufficient power of control to constitute the corsetieres "employees" under the Act and as a corollary to this contends that a more "liberal" meaning should be given to the word "employment" as used in the statutes. It is difficult to see how I can be "liberal" with the congressional mandate without invading the legislative functions, especially in view of the definition in the Treasury Regulation, now of long standing, and approved by the Second Circuit.

In accordance with the rule set forth in Texas Co. v. Higgins, and Radio City Music Hall Corp. v. United States, supra, I find that the corsetieres are not subject to the right of control in the details of their performance by the plaintiff to the degree that they attain the status of "employees" under the Act.

In holding as herein set forth, I feel that I am following the almost unanimous judicial authority on this finding. See Jones v. Goodson, 10 Cir., 121 F.2d 176; United States v. Griswold, 1 Cir., 124 F.2d 599; Anglim v. Empire Star Mines Co., Ltd., 9 Cir., 129 F.2d 914; Indian Refining Co. v. Dallman, D.C., 31 F.Supp. 455, affirmed 7 Cir., 119 F.2d 417; Kentucky Cottage Industries v. Glenn, D.C.W.D.Ky., 39 F.Supp. 642; Burruss v. Early, D.C.W.D.Va. 44 F.Supp. 21; Yellow Cab Co. v. Magruder, D.C.Md. 1943, 49 F.Supp. 605; Walling v. American Needlecrafts, D.C. W.D.Ky., 46 F.Supp. 16. See Restatement of the Law, Agency, §§ 220 and 250; Mechem, on Agency, 2d Ed., § 48, p. 30.

Several rulings of the Treasury Department support my view. S.S.T. 279, C.B. 1938—1, 411, ruling held that sales agents were independent contractors under facts closely comparable with those here, but in that case the manufacturing company retained even greater control than that shown in this case. S.S.T. 334, C.B. 1938—2, 298, ruling held that home demonstrators were not employees; and S.S.T. 331, C.B. 1938 —2, 289, held that salesmen who solicited subscriptions were not employees where they fixed their own time and paid their own expenses.

Whether we call the relationship of the company and the corsetiere that of vendor and vendee, or whether we call the corsetiere an "independent contractor", makes no difference. In my opinion the determination of the Commissioner was wrong.

■ In the light of my decision on the first issue, the second becomes moot as a precise question. However, a few brief comments on the facts relevant to this issue as applied to the issues of "employment" are pertinent. Under the method of selling which is herein presented, the net profits of the corsetieres are dependent on the retail price charged by the corsetieres to consumers (and which the testimony shows to vary from below to above the plaintiff's "recommended retail price") and the expenses of sales, e.g., travelling. The plaintiff does not require either by its contract or objective acts any record of the price to consumers or the expenses in connection with the individual sales nor does any evidence show that the corsetieres keep any such records. It is further evident that corsetieres' net profits (of which the company has no knowledge whatsoever except that which it may surmise from its wholesale price) are a far cry from the usual conceptions of "wages paid" which under Section 1600 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1600, is the basis used for computing the tax. This is persuasive on the parties' attitude on their status toward each other and along with all the other evidence aids in my conclusion that the corsetieres are not "employees" within the Act.

Judgment for the plaintiff in the sum of $20,744.80 and interest from September 25, 1942.

Let Findings and judgment be prepared in accordance with this opinion to be and to be taken as a part of this opinion.