**APARACOR, INC., formerly Queen's-Way to Fashion, Inc.**

v.

**The UNITED STATES.**

**No. 139–73.**

United States Court of Claims.

May 18, 1977.

Warren C. Seieroe, Chicago, Ill., attorney of record, for plaintiff; Lawrence Gerber, Michael R. Fayhee and McDermott, Will & Emery, Chicago, Ill., of counsel.

Richard F. Treacy, Jr., Washington, D. C., with whom was Acting Asst. Atty. Gen., Myron C. Baum, Washington, D. C., for defendant, Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D. C., of counsel.

Before COWEN and SKELTON, Senior Judges, and KUNZIG, Judge.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Louis Spector, filed April 7, 1976, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, with minor modifications by the court, it hereby adopts the decision as modified and hereinafter set forth * as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined in further proceedings under Rule 131(c) in accordance with this opinion.

## OPINION OF TRIAL JUDGE

SPECTOR, Trial Judge: This is a tax case in which the issue is whether or not many thousands of individuals and groups or organizations of individuals engaged in distributing and selling plaintiff's products at retail, and solely on a commission basis, are employees of plaintiff or independent contractors and, therefore, whether or not the commissions they received are "wages," within the intendment of the Federal Insurance Contributions Act (FICA), the Federal Unemployment Tax Act (FUTA), and the statutory provisions on Collection of Income Tax at Source on Wages (Chapters 21, 23 and 24, Internal Revenue Code). At issue are employment taxes for the years 1968, 1969 and 1970. To test the assessment of additional taxes of $2,440,923.05[1] for those 3 years, plaintiff paid and promptly sued for refund of the nominal sum of $101,-021.92 in Federal Unemployment Tax for the year 1970.

Early in the case, an independent issue arose out of plaintiff's motions for production of unpublished rulings of the Commissioner of Internal Revenue, other IRS documents and studies, and for parallel depositions of designated officials to show prior employment tax treatment of other individuals engaged in the business of direct selling on a commission basis. The purpose of the motions was to develop evidence that IRS officials had abused their discretion and acted arbitrarily and capriciously in not according plaintiff the same tax treatment as its competitors, in placing on plaintiff the burden of collection from the individuals primarily liable, and in changing the prior course of conduct on which plaintiff had relied, thus creating an estoppel. By order of April 12, 1974,[2] the court vacated without prejudice the trial judge's allowance of those motions, and directed severance of the "abuse of discretion" and "discrimination" issue, pending prior trial addressed solely to the nature of the relationship of the above-described persons and groups of persons to plaintiff.

■ Whether the relationship of employee or independent contractor exists in a given case is determined by the usual common law tests, and depends essentially upon the facts present in each particular case.[3] In opinions involving different facts, certain criteria and factors have been developed and discussed for use as guidelines in analyzing the relationships present in those factual contexts.[4] Although the factors thus developed cannot usefully be discussed and applied in the abstract, and outside of a specific factual situation under study, they

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed April 7, 1976, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. This sum is, of course, subject to offset of such FICA and income taxes as have been collected from, and paid by the individual and organizational taxpayers involved. Subsequent tax years are also dependent upon the outcome as to these 3 years.

2. 204 Ct.Cl. 836.

3. *Enochs v. Williams Packing Co.,* 370 U.S. 1, 3, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962); *Powers v. United States,* 424 F.2d 593, 191 Ct.Cl. 762 (1970); Treas.Reg. § 31.3121(d)–1.

4. *See,* for example, *Illinois Tri-Seal Prods., Inc. v. United States,* 353 F.2d 216, 223, 173 Ct.Cl. 499, 510 (1965).

do govern the relevancy and materiality of the underlying facts selected and emphasized to make the record in the case at bar. A very large and excellent record has been developed by able counsel in this instance.

■ On the basis of that record, it is concluded that the individuals and groups or organizations of individuals above-described, who were engaged during the years in question in the distribution and sale of plaintiff's products on a commission basis, were not plaintiff's employees within the intendment of Chapters 21, 23 or 24 of the Internal Revenue Code. Virtually none of the characteristics of an employer-employee relationship are demonstrated by this record. Their relationships to plaintiff were, on the contrary, those of independent entrepreneurs to the supplier of a product.

Detailed findings of fact[5] have been furnished to both parties. The facts are sufficiently summarized hereinafter to provide a basis for decision.

Plaintiff is engaged in the business of designing and supplying merchandise, principally women's apparel. At time of trial, plaintiff had 400 employees on whom employment tax forms are regularly filed. The apparel is sold at retail by others, usually by the so-called party plan method. This is a large, nationwide business which had very modest beginnings back in 1952. Its founder, Mrs. Mabel Westerberg, having earned a respite from her family duties, conceived the idea of buying women's apparel and making it available at wholesale to other housewives and mothers, to be distributed and sold at retail in their spare time.

The original retail distributors were personally recruited by the Westerbergs and by a friend who became a partner. In the beginning, shipment would be made on open account to the distributors who would sell at retail and retain the difference as their profit. As the business prospered beyond all original expectations, a more elaborate commission system, characteristic of party plan selling in general, was developed to meet the competition. It was, in fact, a system learned by the Westerbergs from some of the experienced party plan distributors whom they had recruited from other party plan businesses.

Merchandise is shipped c. o. d. for the full retail price, following which commission is paid to the distributor, and so-called "override" commissions are paid to "district," "region," "field" and (for a time) "area" distributors who have recruited and developed larger and larger organizations of individual distributors. Mrs. Westerberg testified that throughout the entire history of her business she had viewed the company's relationship with these distributors as one where the latter are helped to get into business for themselves; as one where her company designed and provided a line of products in which she took justifiable pride; as one where each distributor had complete freedom as to the method and manner in which she conducted her business; and as one where the company has been ready and willing to help with suggestions, but that they are only suggestions which the distributors are totally free to accept or ignore.

The word "termination" is used in company procedures simply to signify that a relationship with a particular distributor has come to an end because of a lack of interest on the part of the distributor. Maintaining an inactive distributor on the company mailing list is expensive, and "termination" is essentially the act of removal from the mailing list. Mrs. Westerberg testified:

---

5. The findings are based on the sworn testimony of 27 witnesses, 15 of whom were offered at trial by plaintiff, three of whom were randomly selected by counsel and treated as court witnesses at trial, one of whom was offered by defendant at trial, and eight of whom were deposed in the course of defendant's pretrial discovery, in a total of five depositions which were then received as evidentiary depositions at trial, by stipulation of counsel. Defendant's counsel objected to the admission of an additional deposition taken in the course of his pretrial discovery and offered by plaintiff. It was excluded. In addition, the record contains a large number of exhibits, and a partial stipulation dealing with matters of a general nature on which counsel were able to agree prior to trial. General procedures, described in the partial pretrial stipulation, were thereafter amplified and clarified at trial.

"We never gave up a girl. She gave us up, but we didn't give her up." If the company's efforts to keep a distributor failed, her name was eventually stricken from mailing lists, but all she had to do to get her name restored was to send in another order.

The current president of the company testified that Queen's-Way has itself never "terminated" a distributor actively engaged in selling its products because that would be incompatible with the company's main objective, namely, increase in sales of its products. There have been a few isolated cases of dishonesty or similar circumstances where on instructions from the leader of a district, region or field, an individual was removed from the mailing list.

Persons engaged individually and directly in party plan distributing and selling are known, in company parlance, as fashion counselors, or merely "counselors." If they are successful in recruiting a number of other counselors, they usually continue to act as an individual counselor earning commissions, but would also earn an override commission on the sales of the counselors they had recruited, and would thereafter be known as "district leaders." By similarly developing additional districts, they could become "regional managers" earning a regional override, or "field supervisors" (the field override). There were also at one time a few "area directors" (area override), but this latter designation was discontinued in 1971. Individuals earning override commissions as district leaders, regional managers, field supervisors or (for a while) area directors, are usually referred to collectively as "managers."

As a matter of general, but not necessarily actual, practice new counselors are actively sought by plaintiff and by the thousands of individuals already engaged in the sale and distribution of plaintiff's products through advertising, and by other less formal means. Advertising by existing distributors is of the cooperative type, that is, plaintiff ordinarily reimburses counselors and managers for one-half the cost of advertising placed by them.

Generally speaking, when sales are by the party plan method, a retail distributor (counselor) persuades another individual to be a "hostess" and to sponsor a party in her home. The latter invites a number of her friends and neighbors. The counselor sets up her sample display, and, after refreshments have been served, she explains the garments she sells in an informal party atmosphere.

Orders of guests are combined into a "party order" sent to plaintiff by the counselor. A combined c. o. d. shipment is later sent to the hostess. As an inducement to the latter, the counselor will ordinarily provide a hostess with gifts or opportunities to buy apparel at substantial discounts. These "hostess favors" are usually geared to the size of the party order. The success of party plan selling is doubtless attributable to the fact that it offers a necessary convenience to homemakers and mothers who cannot shop during regular hours, and who enjoy "shopping" with friends and neighbors in a pleasant social atmosphere, affording an opportunity for exchange of advice and opinions.

Many new counselors are recruited by existing counselors at these parties. A new counselor is obliged to pay for her sample merchandise, and can do so out of future commissions to which she may become entitled. There is a heavy turnover in individual counselors. During a representative 2-year period (1971–73), the annual turnover rate was about 115 percent.

With respect to those individuals who succeed in recruiting and developing large numbers of others into organizations, they are said, in plaintiff's terminology, to have been "promoted" to district, region or field. But, as earlier stated, "promotion" (or "demotion") and all of the other practices which characterize the relationship between plaintiff and its thousands of distributors are not standardized in actual practice, and many managers follow their own procedures. Many of the practices which plaintiff has disseminated in its literature were in fact learned from the individual distributors who developed them within their respective organizations. They would then

percolate upward for eventual sharing by others through publication in plaintiff's guides and manuals, rather than being initiated by plaintiff.

A written contract with plaintiff specified the terms and conditions under which counselors provided their services during the tax years at issue in this case. It provided, in pertinent part, that:

6. The Counselor understands: (1) that she (or he) is an independent, self-employed person in business for herself (or himself) and not an employee of QUEEN'S–WAY TO FASHION, INC.; (2) that she (or he) is not covered through the Company by the Unemployment or Workman's Compensation Act of any state; (3) that she (or he), of her (or his) own choosing, can be covered by the Federal Old Age and Survivors' Insurance benefits under the 1950 Social Security Act by paying this tax direct to the Federal Government.

7. THIS AGREEMENT may be cancelled by the Fashion Counselor, or the Company, at any time.

As plaintiff's president testified, there have been infrequent occasions when Queen's-Way has loaned small amounts of money to certain managers as an advance against future override commissions, and there have been a few isolated instances where it has guaranteed a level of income to a manager for a short period of time. But these are the rare exceptions. No distributor has ever participated in the company's pension or profit sharing plans, nor has ever been given a paid vacation by the company, nor has ever been given paid sick leave. With the exception of two area directors who participated in plaintiff's group hospitalization and life insurance plans, Queen's-Way distributors do not participate in any company group insurance. An accident reimbursement policy was at one time available, with the company offering to pay 50 percent of a nominal premium. There is no indication that any distributor availed herself of it.

As a matter of practice, Queen's-Way pays travel expenses to certain conferences held annually at the company's request, but distributors are not reimbursed for other expenses incurred in running their businesses, and the company does not have a policy of reimbursing distributors for any operating losses they may incur. The company does not require managers to clear their training material or intraorganization bulletins or correspondence with Queen's-Way, nor that they report their training or meeting schedules. Recruiting efforts or accomplishments are not reported, except in the case of company-sponsored contests.

There are no territorial restrictions as to where distributors may recruit or sell. As a practical matter counselors and managers tend to confine their efforts within loosely defined, but nonexclusive, geographic areas. No restrictions are imposed on the means, methods nor the mechanics by which distributors develop and effect sales of plaintiff's products. This is left entirely to the initiative of the individual distributor and the methods employed vary widely in actual practice. The plaintiff does not require that distributors promote and sell particular items within its product line.

Queen's-Way imposes no requirement that distributors must purchase samples as a condition to earning commissions, nor as to the makeup or composition of sample kits if purchased. Distributors do not report to plaintiff on their income or expenses, nor on the amount of time spent in selling or recruiting, that being at the option of each distributor. The plaintiff does not furnish office facilities to any distributor, nor prohibit them from engaging in other work nor in the sale of other products, nor does it impose any requirement that distributors render any services personally.

There are no Queen's-Way requirements governing the compensation, if any, given by distributors to hostesses at whose homes sales are made by the party plan method, nor does the company impose any restrictions on the sharing of commissions and bookings (*i. e.,* parties) between counselors. There is no requirement that a distributor incur advertising expense. If a distributor does elect to employ cooperative advertis-

ing, the company does not require advance approval of the copy as a condition to reimbursement of its 50 percent share.

Queen's-Way does not require that a distributor have an automobile nor does it impose any other restrictions as a prerequisite to becoming a distributor. It does not carry any liability insurance on the activities of distributors, nor has it ever paid such a claim, nor reimbursed a distributor on such a claim. It imposes no restriction on the type of business organization adopted by various distributors, whether as individual proprietorship, partnership, or corporation; nor does it impose any restriction on the hiring by distributors of other persons as their employees to assist the distributors in their respective businesses.

The testimony of a multiplicity of typical managers and counselors, transcribed in over 1400 pages of transcript, provides an accurate insight as to the varied and highly individualistic methods by which they conducted their respective businesses. Their testimony confirms that of plaintiff's officers to the effect that controls were not imposed from above. On the contrary, the company more often than not acted as a clearing house for disseminating what it learned from the successful experiences of individual distributors or organizations. The record provides a large number of examples.

For instance, one Barbara Hollingsworth, who had been distributing apparel on a part-time basis for a direct competitor of plaintiff, dropped that line in favor of plaintiff's fashions in 1965, while still retaining her full-time job as a secretary with Ford Motor Company. By 1967 she had developed a distributing organization of 19 people and was a regional manager. A previously skeptical husband joined her that year and both quit their jobs. By 1971 their organization had grown to over 250. In the early year of 1966, the Hollingsworths incurred expenses in excess of receipts and showed the net operating loss on schedule "C" ("Profit (or loss) from business or profession") of their joint federal income tax return. By 1971, their business return showed a net profit of almost $30,000, after deduction of business expenses exceeding $22,000.

It is noteworthy that Mrs. Hollingsworth (but not her husband) included a schedule "SE" ("Computation of social security self-employment tax") with their 1971 return, whereupon IRS determined that her husband was also liable for that self-employment tax.

The Hollingsworths developed their own system for training and motivating the large number of individuals they recruited into their organization. For example, they preferred contests awards and similar devices over advertising, as a means of recruiting counselors. They encouraged recruits to develop their own organizations because it helped their own business in the form of additional overrides, and the new manager would usually replace herself within the Hollingsworth organization with people or groups selected from her "spin-off" group. There was no interference in the manner in which other managers within the Hollingsworth group conducted their respective businesses. They stressed freedom and independence, and offered help and assistance only. They emphasized good service and the advantages of repeat customers. When individuals left to distribute other products, the Hollingsworths would try to win them back, and they cited one instance where a manager and about 60 of her people left in favor of a competing product line. In 1971 Mr. Hollingsworth joined Queen's-Way as an employee, first as director of eastern sales, and later as vice president of sales.

There were other similar success stories. In 1958 one Maryrose Larson and her husband began distributing Queen's-Way products by the party plan method. They had at that time been engaged in distributing other products for many years, and brought an organization of about 75 commission distributors with them, which then grew to over 1,000. They always regarded Queen's-Way as a supplier of merchandise, and the selling activity as their own business which, for example, Mrs. Larson felt could be

transferred by testamentary bequest. In fact, she had a will drawn bequeathing her organization to her close friend, Ruth Sroka, who meanwhile became a success in her own right. She similarly felt that she had a transferable interest in subordinate groups within her organization, and had on occasion so transferred such groups to other Queen's-Way distributors. When they retired in 1973 the Larsons sold their organization to others in the same business at a selling price geared to override commissions anticipated over a 3-year period, and estimated at $30,000. In the event of their intervening death, payments were to continue to their heirs.

In 1970 the Larsons had gross receipts of about $76,000 against which they offset expenses of about $26,000, and reported a net profit of over $50,000 from their business on schedule "C." The net profit was also reported on the social security, self-employment (SE) form. Their philosophy in running their business was similar to that of the Hollingsworths, as earlier described. The Queen's-Way documents relating to various recruiting, sales, and other factors, and the guidelines on promotions and similar matters, were actually developed by Mrs. Larson and other field managers for the purpose of standardizing their various practices so as to avoid dissension within and between their respective organizations. These factors and guidelines were, however, not rigidly applied and were often disregarded in actual practice in favor of what Mrs. Larson thought best in an individual case. In several instances, for example, she technically "demoted" a girl, and then personally paid her the lost overrides out of her own funds.

Mrs. Larson also experienced the fierce competition from competing product lines. In 1962 she lost four districts and about 40 counselors to a competitor. On another occasion she recruited an entire group of 31 who had been distributing another product, and put them into the organization of her friend, Ruth Sroka.

The experience of another Queen's-Way distributor, Marion Olson, also negates the concept of an employer-employee relationship, and further illustrates the lack of uniformity in the manner in which these various relationships with plaintiff company developed. She was recruited by the Westerbergs in 1959. She started as a field although she had no counselors at the time, but did have prior party plan experience. Within a few months she had recruited 100 counselors in her business, and had formulated her own contests, training and management materials. Many of her ideas have been adopted by Queen's-Way.

When her husband was transferred from New England to Virginia in 1960, she developed a new organization in the Washington-Virginia area, while continuing to manage her New England operation. At its peak, her organization consisted of about 1,000 counselors and managers, and she purchased a motor home to facilitate travel and transport of samples between the two geographical areas. The motor home also served as a meeting and training site in remote areas.

Mr. Olson similarly described the loss and gain of large groups to and from other party plan suppliers. In 1974 the Olsons sold their business to their secretary for a fixed price of $50,000, payable in annual installments. As did the others examined above, Marion Olson held the firm opinion that she was an independent contractor, and not an employee of Queen's-Way, which stood in the relationship of a supplier to her. She customarily told others in her organization that they too were independent contractors and should file their tax returns accordingly. She operated her business in both partnership and corporate form and in Virginia obtained a Business Professional Occupational License from the County.

When operating as a partnership she reported on a partnership return and the distributable partnership income was reported on the partners' individual return. She filed schedule "SE" and paid self-employment tax on those earnings. While the business was conducted in corporate form, receipts and expenses were reported on cor-

porate returns, and the corporation paid Mrs. Olson a salary from which it withheld and paid employment taxes. She incurred sizable expenses in her business (over $41,-000 in 1 year; almost $55,000 in the following year) for salaries paid to two secretaries, commissions and overrides paid to others, travel expenses, costs of fashion shows, contest prizes and supplies; and for the costs of maintaining a separate house which was used 90 percent of the time for business. Similarly, most senior managers in the Olson organization also maintained offices and secretaries.

The experiences described by other of the many witnesses heard was similar. They all operated as persons in business for themselves and, moreover, demonstrated independence from central control. Each had an individualistic style and each employed methods best suited to her individual needs. Mona Evans, originally recruited by the Westerbergs, eventually developed an organization of 1,100 people. Some counselors in her group began selling without first purchasing samples, merely using a Queen's-Way catalog. Many had full-time jobs and, in addition, sold the products of other suppliers. Counselors sold in any manner they wished. Many were assisted by their husbands and, in some instances, it was the men who were designated as the counselors.

Mrs. Evans had a significant investment in her business consisting of about $3,000 (retail) in samples each season, a supply of premium gifts, a full range of office equipment, an office and storage area in her home, and a WATTS telephone line. In January 1974, the Evans through their wholly-owned corporation (The STORE, Inc.) purchased the field of one Fran Latham for $40,000 plus $40,000 more to be paid to the seller for consulting services over a period of 4 years. Mrs. Latham is also employed by The STORE, Inc., and is treated as an employee of the Evans corporation for tax purposes. Mrs. Evans has always reported her commissions and overrides as net earnings on form 1040, schedule "C," and has always paid self-employment tax on her earnings. She has also had a Keogh retirement plan for the self-employed for the last 5 or 6 years. Her 1972 tax return was examined by the IRS and no adjustments were made regarding her payment of self-employment tax, nor to her Keogh plan contributions as a self-employed person. Mrs. Evans considers herself to be conducting her own business under the name of Evans Associates.

Edmund Huddleson and his wife were recruited in 1958–59 and, by 1961–62, their field accounted for over $1 million in sales. At its peak it had sales of about $2½ million a year. He operated mostly by a "seat of the pants" feel, and testified that each of the major fields more or less worked according to their own plans. Mr. Huddleson demonstrated a great degree of independence, and believed that he and his wife were building a business that would produce an income not only for the present but also for the future in the form of a retirement. If someone in the Huddleson group had no sales, and was doing no recruiting, it was assumed the individual involved was no longer with the group. The "demotion" paperwork merely confirmed that fact.

No useful purpose would be served by further detailing the sworn testimony of other witnesses as described in the findings, since it is fully consistent with the foregoing. Some of those who testified described practices which even more strongly militated against a finding of an employer-employee relationship between plaintiff and the managers and counselors.[6]

---

6. One manager couple testified, for example, that they had no rule preventing counselors from selling for more than one party plan company, nor from selling two lines of clothing, nor from selling different lines of products at the same party. They did not care what the counselors sold, believing that it was up to each one to make her own decision. Another counselor (previously a region and a district) explained that she successfully used other sales methods than the party plan, such as walk-in shows, catalog sales and husband and wife shows. As did the others, the witness firmly believed she was self-employed for the reason that she did not work for a salary, no one dictated what time she had to be to work nor "how often I

In summary, the plaintiff's business is clearly that of a supplier to individuals and groups of individuals acting as independent business enterprises, each with its own clientele, and each capable of providing distribution services for a variety of products or other suppliers. There is a keen rivalry for these independent distributors and it is common place for groups to disaffiliate en masse from one supplier and to affiliate with another supplier of competing or noncompeting products.

The remuneration of these distributors depends solely on results accomplished. Plaintiff's primary interest is in maximum sales of its products, and it is not concerned with the ways, means and methods employed to accomplish that result. It has no direct interest in the identity of the persons who accomplish these sales for which it pays commissions, other than a natural interest in avoiding damage to its reputation and goodwill. In other words, the distributors are free of plaintiff's control as to the "when," the "where" and the "how" of performing the functions which generate their commissions and overrides.

There is even lacking here the uniformity which is characteristic of the well-known (and independently owned) fast food franchises which dot the countryside. Queen's-Way imposes no unified management plan from above, as illustrated by the diversity of methods described in testimony of various managers and counselors. Its suggestions in manuals and bulletins are often the result of successful experiences related to plaintiff by the distributors themselves.[7] These independent entrepreneurs engage in other occupations and activities, and some even sell other products while handling those of plaintiff. Their opportunity for large or small profits depends entirely upon their own ingenuity, industry and imagination.

In many cases these distributors make sizable investments, and all bear their own expenses. The opportunity for losses is present, and losses have on infrequent occasions been incurred. The more successful distributors have developed business enterprises with substantial intangible value in the form of good will, and as going concerns. There have been some sales of these enterprises at impressive figures.

Significantly, all the distributors who testified believed in their own minds, and were of the firm opinion, that they were independently engaged in their own businesses and were not employees. Furthermore, all testified that they reported their receipts and expenses either on schedule "C" of form 1040, "Profit (or loss) from business or profession" or form 1120, (corporation return) and, where appropriate, also on schedule "SE" of form 1040, "Computation of social security self-employment tax."

As supplier of the products sold by the distributors, plaintiff was of the same firm opinion regarding their relationship, and always treated the distributors as independent business people. Its contract with them so provided. It has never withheld any employment tax from any of the commissions or overrides paid to them, nor has it ever reflected such distributors as employees on any employment tax returns. On the contrary, plaintiff has historically sent information returns (form 1099, "Statement for recipients of miscellaneous income (annual)") with respect to overrides and, following firm advice from the Internal Revenue Service, also with respect to commissions paid to counselors.

On these facts, the assessment herein represents a radical departure from the tradi-

---

have to work, how much I have to work. That is strictly up to me, how much I want to do." Some persons sold from catalogs during lunch or coffee breaks at the factory where they were employed. Another district (previously counselor) noted that she preferred to pay 100 percent of her advertising costs in order to avoid the nuisance of clearance of her ads by her region.

**7.** The manual itself states:

"The pattern of preparing for a show and presenting it may vary from the precise method used by your local group. Think nothing of it for it is more the same than different. Continue to apply your local methods and do not consider the suggested pattern as a compulsory change for you."

tional common law concept of an employer-employee relationship. The cases support that conclusion. In these intensely factual situations, those precedents involving the same or similar facts are the ones that are persuasive. Plaintiff has cited a host of such cases, and defendant none.

*De-Raef Corp. v. United States,* 70 F.Supp. 264, 108 Ct.Cl. 255 (1947), afforded this court an early opportunity to consider the status of commission distributors for employment tax purposes. The rule was then, as it is now, that the relationship of employee or independent contractor was to be determined in a given case by the usual common law tests. It is further noteworthy that *De-Raef* was decided during a period when there was considerable pressure to expand the definition of "employee" in order to accomplish social objectives. Social Security coverage had not yet been extended to cover the self-employed as it does now, and Congress had not yet reacted to the *Silk* decision (note 19 *infra*) and reaffirmed its intent that common law tests were to be applied.[8] Moreover, the facts in *De-Raef,* although similar to this case, demonstrated to a greater degree the "control" which is characteristic of an employer-employee relationship.[9] Nevertheless, the court found that:

> "Plaintiff was concerned primarily with the volume of sales made and not with the manner by which that result was accomplished. * * *"

The contracts contained no provision for supervision and control over the manner of making the sales and none were in fact exercised. We are, accordingly, of the opinion that, applying the test laid down by the Secretary's regulations, these men were not employees in the sense of the Act, but independent con-tractors. [70 F.Supp. at 271, 108 Ct.Cl. at 267–68.]

In support of its conclusion, this court observed that its conclusion was in harmony with decisions of various circuit courts of appeal, including *McGowan v. Lazeroff,*[10] a case which involved house-to-house salesmen working on a commission basis. In that case also the court had noted the "absence of a supervisory power to control the method and detail of performance" as "the significant factor for present purposes." In response to the Government's argument that the supplier's "power to terminate" the salesman made the latter an employee, the court responded in language equally pertinent to the facts of this case.

> * * * The agreement, if viewed as one bringing into existence a continuing relationship, contained an implied provision calling for termination at the will of either party. Surely the inclusion of such a provision in the informal arrangement could not serve to transform the contract into one of employment. * * *

On the other hand, the arrangement might well be viewed as a succession of similar agreements for separate transactions. For when a sale under the arrangement had been fully accomplished, the salesman was under no legal obligation to render further services and the taxpayer was under no obligation to let the salesman have further merchandise on consignment with a view to its sale. Thus viewed, the business relationship was one that could be legally terminated at the close of any transaction by a mere failure to renew, as distinguished from a positive act of termination. In such a situation, the taxpayer's *power to terminate* a relationship, for which no definite term had been fixed, was entirely consist-

---

8. For a comprehensive discussion of these historical developments, *see United States v. Webb,* 397 U.S. 179, 184, 188, 90 S.Ct. 850, 25 L.Ed.2d 207 (1970); *Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), and *Illinois Tri-Seal Prods., Inc.,* note 4 *supra,* 353 F.2d at 224 *et seq.,* 173 Ct.Cl. at 512 *et seq.*

9. For example, the salesmen in *De-Raef* were limited to specified territories; agreed to sell a certain amount each year; were reimbursed by plaintiff for expenses incurred; and signed contracts stipulating they were to devote their entire time to the work, to report each day as to customers visited and expenses incurred, and not to advertise without the supplier's consent.

10. 148 F.2d 512 (2d Cir. 1945).

ent with the salesmen's status as independent contractors, and must not be confused with a right to discharge which is symptomatic of the relationship of master and servant. [Emphasis in original.[11]]

*Spirella Co. v. McGowan*[12] is even closer on its facts to the case at bar, because it involved a manufacturer of women's foundation garments, sold by thousands of distributors, appropriately called "cosetieres." They were women working in their own communities, individually soliciting customers, and working such hours and at such times as suited their convenience. As in *De-Raef, supra,* there were facts present in *Spirella* which more strongly suggested the degree of control characteristic of an employer-employee relationship than shown in our case.[13] The court nevertheless held the "corsetieres" were not plaintiff's employees, stating:

> The defendant contends that the written contract gives a sufficient power of control to constitute the corsetieres "employees" under the Act and as a corollary to this contends that a more "liberal" meaning should be given to the word "employment" as used in the statutes. It is difficult to see how I can be "liberal" with the congressional mandate without invading the legislative functions, especially in view of the definition in the Treasury Regulation, now of long standing, and approved by the Second Circuit.
>
> In accordance with the rule set forth in *Texas Co. v. Higgins,* [D.C., 32 F.Supp. 4287] and *Radio City Music Hall Corp. v. United States,* [2 Cir., 135 F.2d 715], *supra,* I find that the corsetieres are not subject to the right of control in the

details of their performance by the plaintiff to the degree that they attain the status of "employees" under the Act.[14]

Interestingly, there are cited in this case three Treasury Rulings involving sales agents, home demonstrators and subscription salesmen who were held to be independent contractors and not employees, although the facts demonstrated greater control than shown in *Spirella.* These rulings have more recently been reissued as Revenue Rulings,[15] demonstrating that they still represent the Treasury's views as published for taxpayer guidance.

The familiar "Avon lady" was involved in *Rambin v. Ewing,*[16] a case in which the distributor (not the Government) was insisting she was an employee under the Social Security Act, thus entitling her to coverage which she could not at that time acquire if self-employed. She sold Avon cosmetics door-to-door on 40 percent commission; obtained her initial sales kit at a nominal cost of $5; received goods on consignment but, if delinquent, future shipments were sent c.o.d.; paid her own traveling expenses and worked out of her home. It was assumed for purposes of the decision that she was restricted to a designated territory, was subject to minimum sales quotas and working hours, and was required to attend weekly sales meetings and furnish weekly reports. The court concluded she was *not* an employee under the statutory definition:

> * * * A long line of decisions holds that commission sales representatives are not employees within the coverage of the Social Security Act. The underlying circumstances of the relationship between the sales representatives and company of-

---

**11.** 148 F.2d at 513. The quoted words neatly fit this case where "termination" was in virtually all instances merely a reflection of inactivity on the part of a counselor or manager, and consisted of removal from a costly mailing list, coupled with receptivity to a return of that distributor to the list upon receipt of an order.

**12.** 52 F.Supp. 302 (W.D.N.Y.1943).

**13.** The distributor was given a defined territory and forbidden to sell elsewhere; she was furnished a modeling garment required to be returned; she was required to take company

training and furnish names and addresses of her customers and report information on contacts; and she was prohibited from selling competing products.

**14.** 52 F.Supp. at 305.

**15.** Rev.Rule 71–370, 1971–2 C.B. 345; Rev.Rul. 70–601, 170–2 C.B. 225; and Rev.Rule 70–587, 1970–2 C.B. 224.

**16.** 106 F.Supp. 268 (W.D.La.1952).

ten vary widely from case to case, but commission sales representatives have uniformly been held to be outside the Social Security Act.[17]

The court traced the practical, common-sense methods by which it had reached the foregoing conclusion, stating:

We have read the note of evidence of the hearing (159 pages); have examined all the numerous forms used in the business; and, have considered the contract between the parties, etc.

Thus we have closely sensed the relation. Moreover, we have lived some years and have observed instances of the peculiar type of business involved.

There is not here the relation of employer-employee. *The plaintiff-solicitor is too free; there is no itemized control by the alleged employer.* There is an ultimate object—the sale of the product on a commission basis—*and the manner of attainment of that object, however, is totally left to the individual solicitor.*

There may be one good solicitor like the plaintiff here in a hundred that try; *this is the proof that the application and the character of the solicitor are the main qualifications; she is absolutely the mistress of these characteristics for success in this business.* [Emphasis supplied.[18]]

There are also a number of other cases involving commission sales from a fixed location, rather than from the canvas of a territory. Although not on all fours with the facts of this case, they are far more closely related and relevant than, for example, those cases dealing with typical master-servant relationships in which the servant is directly engaged in performing a relatively menial task in fulfillment of the master's business.[19] Characteristic of these related commission sales cases are those involving bulk oil distributors[20] who operate from a place of business where consigned petroleum products are stored for delivery. Sometimes the place of business is owned by the distributor;[21] in other instances it is furnished by the supplier.[22] Distributors bear their own operating expenses and provide their own equipment. In one case[23] delivery equipment had to comply with the supplier's standards, and in another,[24] both the facility and delivery equipment bore the supplier's name. These oil distributors are compensated on a strictly commission basis, and routinely engage others at their own expense to assist them.

In these cases the power to "terminate," even when coupled with the supplier's right to buy the distributor's plant at cost, has not been deemed such a power "to control" as to constitute the distributor an employee under the common law tests.[25] Nor does

17. 106 F.Supp. at 273.

18. 106 F.Supp. at 274. *See also Sterns v. Clauson*, 122 F.Supp. 795 (S.D.Me.1954), involving commission salesmen engaged in the sale of household merchandise, appliances and furniture. *And see also* the recent decision in *Standard Life & Accident Ins. Co. v. United States*, 75–1 USTC ¶ 9352 (1975), involving insurance agents.

19. *See*, for example, *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); *McCormick v. United States*, 531 F.2d 554, 209 Ct.Cl. 331 (1976); and *Avis Rent A Car System, Inc. v. United States*, 503 F.2d 423 (2d Cir. 1974), cases on which defendant relies.

20. *Glenn v. Standard Oil Co.*, 148 F.2d 51 (6th Cir. 1945); *American Oil Co. v. Fly*, 135 F.2d 491 (5th Cir. 1943); *Indian Refining Co. v. Dallman*, 119 F.2d 417 (7th Cir. 1941); *Texas Co. v. Higgins*, 118 F.2d 636 (2d Cir. 1941); *Gulf Oil Corp. v. United States*, 57 F.Supp. 376

(W.D.Pa.1944), and *Orange State Oil Co. v. Fahs*, 52 F.Supp. 509 (S.D.Fla.1942), *aff'd*, 138 F.2d 743 (5th Cir. 1943).

21. *See Texas Co. v. Higgins*, note 20 *supra*.

22. *See Glenn v. Standard Oil Co.* and *American Oil Co. v. Fly*, note 20 *supra*.

23. *Texas Co. v. Higgins*, note 20 *supra*.

24. *Glenn v. Standard Oil Co.*, note 20 *supra*.

25. " * * * The plaintiff's power to end the agency was merely a power to free itself from all obligations; it was not a legal power to compel Thomas to assent to new proposals, and it might, or might not be effective for that purpose. While the agency lasted the plaintiff had no control at all save that reserved, and Thomas was merely a factor receiving goods on consignment, and a factor is not an 'employee' but an 'independent contractor.' * * * "

the issuance of a supplier's manual to the distributor establish existence of the requisite control.[26] A similar holding is contained in *Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan*[27] in which commission real estate salesmen were held not to be employees. The court observed that:

> * * * Whether the booklet be regarded as the rules and regulations of the plaintiff, as the defendant claims, or as a statement of business policies and helpful suggestions, as the plaintiff asserts, we do not regard as of controlling importance. The booklet reasonably may be regarded as the plaintiff's instructions for the guidance of the salesmen, with which they were expected to, and did, comply in conducting business. * * * [28]

Other types of "commission" cases are also in accord. The facts in *Brady v. Periodical Publishers' Service Bureau, Inc.*,[29] are strikingly similar to those described in this case. In *Brady* it was found that thousands of solicitors and collectors of magazine subscriptions were not employees because they—

> * *· * determine for themselves on what days, during what hours, and how their work shall be done; whether they shall be helped by relatives, neighbors, or others; whether the work shall be done by foot, trolley, bus, or automobile travel; by personal visits, by telephone calls to subscribers, or by mail; and numerous other details of the work. Most of the persons thus engaged do not devote their entire time and attention to this work, but treat it merely as a sideline in addition to their regular business or housekeeping activities. They are free to determine their own means and methods of turning in their reports of collection and their collections, less commissions. The appellee pays them only for results actually accomplished. *The findings make it clear that the appellee does not control their means and manner of work.* [Emphasis supplied. 173 F.2d at 777–78.[30]]

---

*Texas Co. v. Higgins*, note 20 *supra*, 118 F.2d at 638.

*In accord, American Oil Co. v. Fly*, note 20 *supra*, 135 F.2d at 493:

"* * * Although the business done is the business of the Oil Company and the products and their proceeds are its property, the distributors are not employees under the Act, and the persons they employ, though employees, are not the employees of the Oil Company. * * *"

**26.** In the *Texas Co. v. Higgins* case, note 20 *supra*, the court quoted from the preface to the manual:

"This Manual * * * is intended to serve as a guide to more successful and efficient bulk plant operation. * * * The suggestions contained herein are the result of many years of experience. * * * They are offered to consignees in the spirit of helpfulness and with the sincere desire that the greatest benefits may be secured by all." 118 F.2d at 637.

*See also Glenn v. Standard Oil Co.*, note 20 *supra*, 148 F.2d at 55, and compare with the manual in this case, note 7 *supra*.

"Manufacturers of nationally advertised products frequently impose many conditions on the merchants who sell such products. They also are cooperative with the merchant and aid in every way possible the sales of their merchandise. For example, a manufacturer will frequently operate a booth in a department store for the purpose of demonstrating and acquainting the public with its products. If in the case at bar Kolb [the distributor] and his employees are held to be employees of the Indian Refining Company, it would be but a step further to hold many merchants to be employees of manufacturers." *Indian Refining Co. v. Dallman*, 31 F.Supp. 455, 458 (S.D.Ill. 1940), *aff'd per curiam*, 119 F.2d 417 (7th Cir. 1941).

*See also* Rev.Rul. 70–446, 1970–2 C.B. 215, holding that all bulk plant agents who operate in a substantially similar way will be regarded as independent contractors, not employees.

**27.** 179 F.2d 882 (8th Cir. 1950).

**28.** 179 F.2d at 887.

**29.** 173 F.2d 776 (6th Cir. 1949).

**30.** *In accord, Benson v. Social Sec. Bd.*, 172 F.2d 682 (10th Cir. 1949), involving a commission salesman of foundry products; *Ewing v. Vaughan*, 169 F.2d 837 (4th Cir. 1948), involving commission distributors selling flour and feed products; *Henry Broderick, Inc. v. Squire*, 163 F.2d 980 (9th Cir. 1947), real estate brokers; *Mackatunas v. Finch*, 301 F.Supp. 1289 (E.D.Pa.1969), commission selling of lottery tickets; *Hemmerle v. Hobby*, 114 F.Supp. 16 (D.N.J.1953), a commission salesman of lathes; *G. W. Allen & Co. v. Henslee*, 86 F.Supp. 295 (M.D.Tenn.1949), real estate salesmen; *Gause-Ware Serv. Ins. Co. v. Thomas*, 76 F.Supp. 626

Finally, our attention has been drawn to the very recent *Simpson* case in the Tax Court [31] in which, on strikingly similar facts, the Internal Revenue Service, in the exact reverse of its position in this case, was urging that the taxpayer (a commission insurance salesman) was an independent contractor, not an employee, and therefore liable for self-employment tax.[32] As in Queen's-Way, Simpson was one of thousands of agents (or distributors) working on a strictly commission basis and paid solely for results accomplished. As in Queen's-Way, his insurance company provided the incentive of overriding commissions calculated to induce existing agents and managers to recruit others. In both enterprises, manuals covering procedural matters and suggested techniques were provided, as were aids for training new recruits (although training was much more extensive in the *Simpson* case). In both cases, distributors or agents purchased their own necessary equipment and paid all their own operating expenses (except for 50 percent reimbursement of certain cooperative advertising). Neither enterprise provided any of the fringe benefits characteristic of employees, and attendance at meetings was non-obligatory. In *Simpson*, as in this case, the distributors or agents were of the opinion they had created independent contractor relationships, and in both cases, their contracts so stated. Both groups set their own working hours, were generally free of territorial restriction, and did not have to account for their activities.[33] In both enterprises the distributors or agents were free to engage in other activities, although

there were some restrictions in *Simpson*, which drew comment in the court's opinion. Significantly, in both cases, the business of a distributor or agent was recognized as capable of developing independent value, which could be realized by the individual through sale or transfer.

The court held for the Government, that is, it concluded that the taxpayer was *not* an employee but an independent contractor, liable for self-employment tax. It emphasized, *inter alia*, that:

> \* \* \* Simpson and not Farmers [the company], was the party responsible for investing in the facilities utilized in the sale of insurance. He maintained his own office for which he purchased the needed equipment and supplies without reimbursement from Farmers. He maintained a separate office in his home although not required to do so by Farmers. He employed his own secretary and fixed all the terms and conditions of her employment. Other than paying for approximately one-half of Simpson's advertising expenses during 1970, no evidence was presented to show any investment in the facilities by Farmers. [64 T.C. at 988.]

Because Simpson's compensation was (except for certain bonuses) in the form of commissions, the court further emphasized that "his opportunity for, and the degree to which he might make, a profit or loss in any given year was solely dependent upon his own efforts and skill as an insurance salesman.[34] The conclusion in *Simpson* on facts closely resembling our own, was developed by application of "the relevant factors to

---

(N.D.Tex.1946), industrial insurance salesmen; and *Cannon Valley Milling Co. v. United States*, 59 F.Supp. 785 (Minn.1945), commission distributors selling flour and feed products.

**31.** *Simpson v. Commissioner*, 64 T.C. 974 (Aug. 28, 1975).

**32.** Under 26 U.S.C. §§ 1401–02. This is the opposite side of the statutory coin involved in this case (chs. 21, 23 & 24 of title 26), which imposes employer's tax on wages paid to an employee.

**33.** Although the *Simpson* record featured strong evidence of a "produce or else" attitude

on the part of a manager (who was also an independent contractor).

**34.** Also noteworthy is this quote from the opinion:

"Thus from an examination of the entire record relating to the working relationship between the district managers and their agents, it appears that the use of the word 'supervision' in the Planning Guide reflects, at best, a careless and imprecise usage of the English language." *Simpson v. Commissioner*, note 31 *supra*, 64 T.C. at 987–88.

which the courts have looked in determining the substance of the employment relationship" as spelled out, *inter alia*, by this court's *Illinois Tri-Seal* decision.[35]

Any or all of the same relevant factors point strongly toward an independent contractor relationship in the case of the distributors of Queen's-Way products. Virtually no control was exercised by Queen's-Way over the details of their work. They, and not Queen's-Way, invested in the facilities used in their work. They had an opportunity for profit (from nominal to significant) or for a loss. The "termination" of the relationship, when it occurred, was akin to that described in *McGowan v. Lazeroff*, note 10 *supra*, and the other cases above-discussed. It was a disengagement by mutual agreement, usually signaled by inactivity on the part of a distributor. Their work was not part of Queen's-Way's regular business. The latter was engaged in the business of designing and supplying merchandise,[36] not its retail distribution. For the most part the relationship of most distributors to Queen's-Way, unlike that of a typical employee, was very short and there was a 115 percent annual turnover. Women often became counselors with a short-term limited financial objective in mind. Those who were or became highly skilled and stayed on, developed valuable businesses.[37] Last but not least, the parties themselves believed and were firmly of the opinion that their relationship was that of independent entrepreneur and supplier.

Numerous Revenue Rulings[38] reflect the long line of judicial authority traced above. Revenue Rulings in this type of case are particularly enlightening because they necessarily spell out the factual underpinning in comparative situations to explain the basis for each ruling.[39]

The facts in this case call to mind the words employed in *Saiki v. United States*.[40]

The independent contractor status has long been recognized in the law. Parties have a perfect right, in their dealings with each other, to establish such status in order to avoid the relationship of employer-employee. Here the parties made every attempt to create the sexers as independent contractors. The reasons may be one or more of many, but that is not the point. They had the right to the relationship if they desired to create it. We are at an utter loss to point out what additional arrangements should have been made or what arrangements should have been omitted in order to create the sexers as independent contractors. *What more these parties could have done to establish the relationship they desired we do not know.* By all the tests usually applied to determine status, Harold H. Tatsumi was an independent contractor. The trial court should have so found as a matter of law. * * * [Emphasis supplied.[41]]

---

**35.** Note 4 *supra*.

**36.** As stated in *Silk*, note 19 *supra*, 331 U.S. at 712, 67 S.Ct. at 1468:
"* * * The distributor who undertakes to market at his own risk the product of another * * * ordinarily cannot be said to have the employer-employee relationship. Production and distribution are different segments of business. * * *"

**37.** *Cf. Rambin v. Ewing*, note 18 *supra*.

**38.** Official interpretations of the IRS "published for the information and guidance of taxpayers, Internal Revenue Service officials, and others concerned." Treas.Reg. § 601.201(a)(6).

**39.** *See* Rev.Rules 71–370, 70–601 and 70–587, note 15 *supra*. Also, Rev.Ruls. 75–229, 1975–24 IRB 12; 74–389, 1974–32 IRB 13; 74–333, 1974–27 IRB 27; 73–479, 1973–2 C.B. 334; 73–

374, 1973–2 C.B. 331; 70–619, 1970–2 C.B. 228; 69–287, 1969–1 C.B. 257, 69–288, 1969–1 C.B. 258; 55–734, 1955–2 C.B. 413; and 54–412, 1954–2 C.B. 335. *See also, Tristate Developers, Inc. v. United States*, n. 2, 549 F.2d 190, 191, n. 2, 212 Ct.Cl. —— (1977).

**40.** 306 F.2d 642 (8th Cir. 1962).

**41.** 306 F.2d at 652. The extended discussion of the facts and relevant factors in this case is a function of defendant's abrupt departure from existing case law and rulings in comparable situations. The resultant and understandable alarm on the part of plaintiff that its business and the industry of which it is a part are thereby threatened with destruction has resulted in a very large record and lengthy arguments not normally found in a single issue case with a readily apparent solution. *See Rambin v. Ewing*, note 16 *supra*.

In the face of an overwhelming number of factual parallels and authorities to the contrary, defendant's reliance is on the three cases cited in note 19 *supra.* The simple answer to these is that they involve typical (albeit temporary) master-servant relationships, that is, the performance of relatively simple labor, *in the course of and as an integral part of the employer's business.* The workers in *Silk* shoveled coal for a coal company; those in *Avis* shuttled cars for a rental company; and those in *McCormick* exercised or walked horses for a horse trainer. *Silk* is relied upon because, in defendant's view, it appeared to broaden the definition of employee, and to de-emphasize the important factor of control which is highlighted in the current common law tests. The simple answer to this is that *Silk* is one of the cases which prompted the reaffirmation of the common law tests by the Congress in the so-called "status quo" amendment or Gearhart resolution; [42] that even if all of the relevant factors earlier discussed are weighed equally along with degree of control, these distributors meet the requirements for independent contractors; [43] and that *Silk* not only involved coal shovelers, but also coal truck drivers who were found in *Silk* to be independent contractors, when measured against the relevant factors.[44]

It is concluded that plaintiff is entitled to recover and judgment should be entered to that effect.

## CONCLUSION OF LAW

Upon the findings of fact and foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect, with the determination of the exact amount of recovery to be reserved for further proceedings under Rule 131(c) in accordance with this opinion.

**42.** *See* cases cited in note 8 *supra.* The legislative history is also exhaustively covered in plaintiff's brief.

**43.** *See* text at notes 35, 36 and 37 *supra.*

